[L.A. No. 31850. May 13, 1985.]

COUNTY SANITATION DISTRICT NO. 2 OF LOS ANGELES
COUNTY, Plaintiff and Respondent, v.
LOS ANGELES COUNTY EMPLOYEES' ASSOCIATION,
LOCAL 660, SERVICE EMPLOYEES INTERNATIONAL UNION,
AFL-CIO et al., Defendants and Appellants.

■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■

COUNSEL

Geffner & Satzman, Leo Geffner and Jeffrey Paule for Defendants and Appellants.

Charles P. Scully, Donald C. Carroll, Charles P. Scully II, Jennifer Friesen, Fred Okrand, Glenn Rothner, Anthony R. Segall, Reich, Adell & Crost, Victor J. Van Bourg, Van Bourg, Allen, Weinberg & Roger, A. Eugene Huguenun, Jr., Michael R. White, Raymond L. Hansen, Charles R. Gustafson, Henry R. Fenton and Levy, Ansell & Goldman as Amici Curiae on behalf of Defendants and Appellants.

Musick, Peeler & Garrett, Stuart W. Rudnick, Steven D. Weinstein and Neil O. Andrus for Plaintiff and Respondent.

George Agnost, City Attorney (San Francisco), Philip S. Ward and Steven A. Diaz, Deputy City Attorneys, H. Jess Senecal, Jack T. Swafford, Burris, Lagerlof, Swift & Senecal, Robert E. Murphy, Robin Leslie Stewart, Kronick, Moskovitz, Tiedemann & Girard, Ronald A. Zumbrun and Anthony T. Caso as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**BROUSSARD, J.**—Defendants appeal from a judgment awarding plaintiff sanitation district damages and prejudgment interest in connection with defendant union's involvement in a labor strike against plaintiff. The case squarely presents issues of great import to public sector labor-management relations, namely whether all strikes by public employees are illegal and, if so, whether the striking union is liable in tort for compensatory damages. After careful review of a long line of case law and policy arguments, we conclude that the common law prohibition against all public employee strikes is no longer supportable. Therefore, the judgment for the plaintiff finding the strike to be unlawful and awarding damages, interest and costs must be reversed.

I. *Statement of the Case.*

Defendant union (Local 660 or the union) is a labor organization affiliated with the Service Employees International Union, AFL-CIO, and has been the certified bargaining representative of the blue collar employees of the Los Angeles Sanitation District since 1973. Plaintiff is one of 27 sanitation

districts within Los Angeles County[1] and is charged with providing, operating and maintaining sewage transport and treatment facilities and landfill disposal sites throughout the county.[2] The District employs some 500 workers who are directly or indirectly responsible for the operation and maintenance of its facilities and who are members of, or represented by, Local 660. Since 1973, the District and Local 660 have bargained concerning wages, hours and working conditions pursuant to the Meyers-Milias-Brown Act (MMBA). (Gov. Code, §§ 3500-3511.) Each year these negotiations have resulted in a binding labor contract or memorandum of understanding (MOU). (See *Glendale City Employees' Assn.* v. *City of Glendale* (1975) 15 Cal.3d 328 [124 Cal.Rptr. 513, 540 P.2d 609].)

On July 5, 1976, approximately 75 percent of the District's employees went out on strike after negotiations between the District and the union for a new wage and benefit agreement reached an impasse and failed to produce a new MOU. The District promptly filed a complaint for injunctive relief and damages and was granted a temporary restraining order. The strike continued for approximately 11 days, during which time the District was able to maintain its facilities and operations through the efforts of management personnel and certain union members who chose not to strike.[3] On July 16, the employees voted to accept a tentative agreement on a new MOU, the terms of which were identical to the District's offer prior to the strike.

The District then proceeded with the instant action for tort damages. The trial court found the strike to be unlawful and in violation of the public policy of the State of California and thus awarded the District $246,904 in compensatory damages,[4] prejudgment interest in the amount of $87,615.22 and costs of $874.65.

---

[1]Each such district is a separate and autonomous political subdivision of the State of California, authorized by Health and Safety Code section 4700 et seq. County Sanitation District No. 2 of Los Angeles County is authorized by a joint powers agreement to act on behalf of itself and the 26 other districts in numerous matters, including personnel and labor relations. (These 27 sanitation districts are hereinafter jointly referred to as the District.)

[2]In 1976, the facilities operated by the District included 6 sanitary landfills which together received about 15,000 tons of solid waste each day, 11 treatment plants processing 450 million gallons of raw sewage per day, 4 maintenance yards, and 46 pumping stations. In maintaining these operations, the District served approximately 4 million residents of the county.

[3]The union maintains that the strike settled on July 12, while the trial court's findings agreed with the District's contention that the strike settled on July 16. In addition, the District maintained that the strike was not entirely peaceful and had alleged various acts of vandalism were committed by the strikers. The union denied these charges in full.

[4]This figure represents the following strike-related damages: Wages and FICA payments: $304,227; earned compensatory time off valued at $16,040; miscellaneous security, equip-

II. *The Traditional Prohibition Against Public Employee Strikes.*

Common law decisions in other jurisdictions at one time held that no employee, whether public or private, had a right to strike in concert with fellow workers. In fact, such collective action was generally viewed as a conspiracy and held subject to both civil and criminal sanctions.[5] Over the course of the 20th century, however, courts and legislatures gradually acted to change these laws as they applied to private sector employees; today, the right to strike is generally accepted as indispensable to the system of collective bargaining and negotiation, which characterizes labor-management relations in the private sector.[6]

By contrast, American law continues to regard public sector strikes in a substantially different manner. A strike by employees of the United States government may still be treated as a crime,[7] and strikes by state and local employees have been explicitly allowed by courts or statute in only 11 states.[8]

---

ment and meal expenses: $55,080; health care benefits paid to striking employees: $6,000; less a $134,443 set off in wages, FICA and retirement benefits that the District did not have to pay out on behalf of striking workers.

[5] See *Commonwealth* v. *Pullis* (Mayor's Ct. Phil. 91806) reported in 3 Commons, Documentary History of American Industrial Society (1910) p. 59; *Walker* v. *Cronin* (1871) 107 Mass. 555; *Vegelahn* v. *Guntner* (1896) 167 Mass. 92 [44 N.E. 1077]; *Loewe* v. *Lawlor* (1908) 208 U.S. 274 [52 L.Ed. 488, 28 S.Ct. 301].

[6] Congress gradually, through a series of legislative enactments, not only granted private sector employees a right to strike and to engage in other concerted activities, but also deprived employers of their traditional remedies of injunction and damage suits. (See 38 Stat. 730 (1914) [Clayton Antitrust Act], codified as amended at 15 U.S.C. §§ 15, 17, 26 (1970), 29 U.S.C. § 52 (1970); 47 Stat. 70 (1930) [Norris-La Guardia Act], codified at 29 U.S.C. §§ 101-115 (1970); 47 Stat., pt. II 577 (1926) [Railway Labor Act], codified as amended at 45 U.S.C. §§ 151-188 (1970); 49 Stat. 449 (1935) [Wagner Act], codified as amended at 29 U.S.C. §§ 141-197 (1970).)

[7] Employees of the federal government are statutorily prohibited from striking under 5 United States Code section 7311 (1976), which prohibits an individual from holding a federal position if he "participates in a strike, or asserts the right to strike against the Government of the United States . . . ." In *United Federation of Postal Clerks* v. *Blount* (D.D.C. 1971) 325 F.Supp. 879, affd., 404 U.S. 802 [30 L.Ed.2d 38, 92 S.Ct. 80] (1971), the court upheld the constitutionality of the strike prohibitions, yet declared unconstitutional the "wording insofar as it inhibits the *assertion* of the right to strike. . . ." (*Id.* at p. 881 [italics in original].) In 1947, Congress originally denied federal employees the right to strike in section 305 of the Labor Management Relations Act (Taft-Hartley Act), chapter 120, 61 Statutes at Large 136 (1947). This act was repealed and ultimately replaced by section 7311.

[8] Those 11 states are Alaska, Hawaii, Idaho, Illinois, Minnesota, Montana, Ohio, Oregon, Pennsylvania, Vermont, and Wisconsin. (See further discussion below.) Interestingly, the United States is virtually alone among Western industrial nations in upholding a general prohibition of public employee strikes. Most European countries have permitted them, with certain limitations, for quite some time as has Canada. See, e.g., Anderson, *Strikes and Impasse Resolution in Public Employment* (1969) 67 Mich.L.Rev. 943, 961-964.

Contrary to the assertions of the plaintiff as well as various holdings of the Court of Appeal,[9] this court has repeatedly stated that the legality of strikes by public employees in California has remained an open question. In *Los Angeles Met. Transit Authority v. Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 687-688 [8 Cal.Rptr. 1, 355 P.2d 905], this court stated in dictum that "[i]n the absence of legislative authorization public employees in general do not have the right to strike . . ." but proceeded to hold that a statute affording public transit workers the right " 'to engage in other concerted activities for the purpose of collectively bargaining or other mutual aid or protection' " granted these employees a right to strike. However, in our very next opinion on the issue, *In re Berry* (1968) 68 Cal.2d 137 [65 Cal.Rptr. 273, 436 P.2d 273], we invalidated an injunction against striking public employees as unconstitutionally overbroad, and *expressly* reserved opinion on "the question whether strikes by public employees can be lawfully enjoined." (*Id.*, p. 151.)

In our next opportunity to examine public employee strikes, *City and County of San Francisco v. Cooper* (1975) 13 Cal.3d 898 [120 Cal.Rptr. 707, 534 P.2d 403], which involved a suit challenging the validity of a strike settlement agreement enacted by the city, we held only that such settlement agreements are valid. After noting the Court of Appeal holdings that public employee strikes are illegal and the employees' counterargument that such strikes are impliedly authorized by statute, our unanimous opinion declared that we had no occasion to resolve that controversy in that action. (*Id.*, p. 912.)

In a similar vein, this court has carefully and explicitly reserved judgment on the issue of the legality of public employee strikes on at least three other occasions in recent years.[10] Indeed, our reluctance to address the issue head-on has elicited critical commentary from both dissenting and concurring

---

[9]See, e.g., *Stationary Engineers v. San Juan Water Dist.* (1979) 90 Cal.App.3d 796, 801 [153 Cal.Rptr. 666]; *Pasadena Unified Sch. Dist. v. Pasadena Federation of Teachers* (1977) 72 Cal.App.3d 100 [140 Cal.Rptr. 41]; *Service Employees' International Union, Local No. 22 v. Roseville Community Hosp.* (1972) 24 Cal.App.3d 400, 408 [101 Cal.Rptr. 69]; *Trustees of Cal. State Colleges v. Local 1352, S.F. State etc. Teachers* (1970) 13 Cal.App.3d 863, 867 [92 Cal.Rptr. 134]; *City of San Diego v. American Federation of State etc. Employees* (1970) 8 Cal.App.3d 308, 310 [87 Cal.Rptr. 258]; *Almond v. County of Sacramento* (1969) 276 Cal.App.2d 32, 35 [80 Cal.Rptr. 518].

[10]*San Diego Teachers Assn. v. Superior Court* (1979) 24 Cal.3d 1 [154 Cal.Rptr. 893, 593 P.2d 838]; *El Rancho Unified School Dist. v. National Education Assn.* (1983) 33 Cal.3d 946 [192 Cal.Rptr. 123, 663 P.2d 893]; and *International Brotherhood of Electrical Workers v. City of Gridley* (1983) 34 Cal.3d 191 [193 Cal.Rptr. 518, 666 P.2d 960].

opinions, which have urged us to resolve the question once and for all.[11] While we had ample reason for deciding the aforementioned cases without determining the broader question of the right of public employees to strike, the instant case presents us with the proper circumstances for direct consideration of this fundamental issue.

Before commencing our discussion, however, we must note that the Legislature has also chosen to reserve judgment on the general legality of strikes in the public sector. As Justice Grodin observed in his concurring opinion in *El Rancho Unified School Dist.* v. *National Education Assn., supra,* 33 Cal.3d 946, 964, "the Legislature itself has steadfastly refrained from providing clearcut guidance." ▮ With the exception of firefighters (Lab. Code, § 1962), no statutory prohibition against strikes by public employees in this state exists.[12] The MMBA, the statute under which the present controversy arose, does not directly address the question of strikes.

The MMBA sets forth the rights of municipal and county employees in California.[13] (Gov. Code, §§ 3500-3511.) The MMBA protects the right of such employees "to form, join, and participate in the activities of employee

[11]See, e.g., dissenting opinion of Richardson, J., in *San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d 1 and concurring opinion of Richardson, J., in *El Rancho Unified School Dist.* v. *National Education Assn., supra,* 33 Cal.3d at page 962, where he stated that "[t]his court should no longer continue its hesitant, tentative ritual dance around the perimeter of this central legal principle. . . ."

[12]For just one example, the Winton Act (former Ed. Code, § 13080 et seq.), which governed the relationship between local school boards and teachers' unions, neither affirmed nor rejected the teachers' right to strike. In 1975 the Legislature repealed the Winton Act and added new provisions to the Government Code to establish an Education Employment Relations Board (see Gov. Code, § 3540 et seq.); the new enactment also does not prohibit strikes by teachers. It also bears mention that the California Assembly Advisory Council on Public Employee Relations in its final report of March 15, 1973, concluded that, "[s]ubject only to [certain specified] restrictions and limitations . . . public employees should have the right to strike" (p. 24) and proposed a statute to carry out these goals (appen. a). However, this proposed statute was never enacted into law, perhaps further reflecting a legislative decision to leave the ultimate determination of this thorny issue to the judiciary.

[13]The MMBA revised its predecessor, the Brown Act, in 1968. The MMBA amendments, however, apply only to local government employees because the MMBA deleted reference to the "State of California" and explicitly defined "public employee" as one employed by any political subdivision of the state. (See Gov. Code, § 3501.) Presently, state employees are governed by the State Employer-Employee Relations Act (Gov. Code, §§ 3512-3524).

Additional groups of employees were excepted from coverage under the Brown Act by previous legislation. These employees are consequently not covered by the MMBA. (See Pub. Util. Code, §§ 25051-25052, added by Stats. 1955, ch. 1036, § 2 at pp. 1960-1961 [governing bargaining between employees of the Alameda-Contra Costa Transit District and their employers]; Pub. Util. Code, Appen. 1, § 3.6(b)-(g) [governing bargaining in the Los Angeles Metropolitan Transit Authority]; Ed. Code, §§ 13080-13089 [governing educational employees].)

For a detailed discussion of the scope and purposes of the MMBA, see Grodin, *Public Employees Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719; Note, *Collective Bargaining Under the Meyers-Milias-Brown Act— Should Local Employees Have the Right to Strike* (1984) 35 Hastings L.J. 523.

organizations . . . for the purpose of representation on all matters of employer-employee relations." It also requires public employers to "meet and confer" in good faith with employee representatives on all issues within the scope of representation. As explained in its preamble, one of the MMBA's main purposes is to improve communications between public employees and their employers by providing a reasonable method for resolving disputes. A further stated purpose is to promote improved personnel relations by "providing a uniform basis for recognizing the right of public employees to join organizations of their own choice."[14]

On its face, the MMBA neither denies nor grants local employees the right to strike. This omission is noteworthy since the Legislature has not hesitated to expressly prohibit strikes for certain classes of public employees. For example, the above-noted prohibition against strikes by firefighters was enacted nine years before the passage of the MMBA and remains in effect today. Moreover, the MMBA includes firefighters within its provisions. Thus, the absence of any such limitation on other public employees covered by the MMBA at the very least implies a lack of legislative intent to use the MMBA to enact a general strike prohibition.[15]

Plaintiffs have suggested that section 3509 of the MMBA must be construed as a general prohibition on the right to strike because it specifically precludes the application of Labor Code section 923[16] to public em-

---

[14]However, the MMBA contains no clear mechanism for resolving disputes. It merely provides that if the parties fail to reach an agreement, they *may* agree to appoint a mediator or use other impasse resolution procedures agreed upon by the parties. Additionally, the MMBA does not authorize the establishment of an administrative agency to resolve controversies arising under its provisions. In contrast, statutes governing other public employees in California authorize the Public Employee Relations Board (PERB) to resolve disputes and enforce the provisions of the legislation. (See Gov. Code, § 3541.3 (setting the powers and duties of the PERB under the Educational Employment Relations Act (EERA)); and Gov. Code, § 3513, subd. (g) [making the powers and duties of the PERB under the EERA applicable to the State Employees Relations Act].)

[15]Apparently this decision was the result of political compromise and/or a desire that the courts would take the difficult first step of unambiguously indicating whether public employees generally have the right to strike. As one noted commentator explains, "The entire subject of strikes and impasse resolution procedures is avoided, except for the declaration that the parties may elect to engage a mediator. What emerges is a rather general legislative blessing for collective bargaining at the local governmental level without clear delineation of policy or means for its implementation. The courts have, on the whole, done an admirable job of exegesis, but their decisions cannot help but reflect the underlying weakness of the text." (Grodin, *op. cit. supra,* 23 Hastings L.J. at p. 761.)

[16]Section 923 provides in pertinent part: ". . . the individual workman [shall] have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference . . . of employers . . . in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

ployees. Labor Code section 923 has been construed by this court to protect the right of private sector employees to strike (see *Petri Cleaners, Inc.* v. *Automotive Employees, etc. Local No. 88* (1960) 53 Cal.2d 455 [2 Cal.Rptr. 470, 349 P.2d 76]); yet, an examination of other California statutes governing public employees makes it perfectly clear that section 3509 was *not* included in the MMBA as a means for prohibiting strikes.

A provision identical to section 3509 is contained in the statutes governing educational employees and firefighters. However, an explicit strike prohibition is included in the firefighters statute *in addition* to this provision. The fact that the Legislature felt it necessary to include this express strike prohibition clearly indicates that it neither intended nor expected its preclusion of section 923 to serve as a blanket prohibition against strikes. Furthermore, in *San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d at page 13, this court interpreted section 3549 of the EERA, a provision *identical to* section 3509 of the MMBA, as specifically *not* prohibiting strikes. Therefore, plaintiff's assertion that section 3509 must be read as a legislative prohibition of public employee strikes cannot be sustained.[17]

In sum, the MMBA establishes a system of rights and protections for public employees which closely mirrors those enjoyed by workers in the private sector. The Legislature, however, intentionally avoided the inclusion of any provision which could be construed as either a blanket grant or prohibition of a right to strike, thus leaving the issue shrouded in ambiguity. In the absence of clear legislative directive on this crucial matter, it becomes the task of the judiciary to determine whether, under the law, strikes by public employees should be viewed as a prohibited tort.

III. *The Common Law Prohibition Against Public Employee Strikes.*

As noted above, the Court of Appeal and various lower courts in this and other jurisdictions have repeatedly stated that, absent a specific statutory grant, all strikes by public employees are per se illegal. A variety of policy rationales and legal justifications have traditionally been advanced in support of this common law "rule," and numerous articles and scholarly

---

[17]Since the present case involves employees subject to the MMBA, we do not consider whether provisions of statutes governing other employees could be interpreted to limit the right of such employees to strike.

treatises have been devoted to debating their respective merits.[18] The various justifications for the common law prohibition can be summarized into four basic arguments. First—the traditional justification—that a strike by public employees is tantamount to a denial of governmental authority/sovereignty. Second, the terms of public employment are not subject to bilateral collective bargaining, as in the private sector, because they are set by the legislative body through unilateral lawmaking. Third, since legislative bodies are responsible for public employment decisionmaking, granting public employees the right to strike would afford them excessive bargaining leverage, resulting in a distortion of the political process and an improper delegation of legislative authority. Finally, public employees provide essential public services which, if interrupted by strikes, would threaten the public welfare.

Our determination of the legality of strikes by public employees necessarily involves an analysis of the reasoning and current viability of each of these arguments. The first of these justifications, the sovereignty argument, asserts that government is the embodiment of the people, and hence those entrusted to carry out its function may not impede it.[19] This argument was

---

[18]Among the more notable works to appear recently on the subject of labor relations in the public sector are: Hanslowe & Acierno, *The Law and Theory of Strikes By Government Employees* (1982) 67 Cornell L.Rev. 1055; Comment, *Public Employee Legislation: An Emerging Paradox, Impact, and Opportunity* (1976) 13 San Diego L.Rev. 931; Comment, *California Assembly Advisory Council's Recommendations on Impasse Resolution Procedures and Public Employee Strikes* (1974) 11 San Diego L.Rev. 473; Comment, *The Collective Bargaining Process at the Municipal Level Lingers in Its Chrysalis Stage* (1974) 14 Santa Clara Law. 397; Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719; Shaw & Clark, *The Practical Differences Between Public and Private Sector Collective Bargaining* (1972) 19 UCLA L.Rev. 867; Lev, *Strikes by Government Employees: Problems and Solutions* (1971) 57 A.B.A.J. 771; Witt, *The Public Sector Strike: Dilemma of the Seventies* (1971) 8 Cal. Western L.Rev. 102; Bernstein, *Alternatives to the Strike in Public Labor Relations* (1971) 85 Harv.L.Rev. 459; Burton & Krider, *The Role and Consequences of Strikes by Public Employees* (1970) 79 Yale L.J. 418; Wellington & Winter, *More on Strikes by Public Employees* (1970) 79 Yale L.J. 441; Kheel, *Strikes and Public Employment* (1969) 67 Mich.L.Rev. 931; Anderson, *Strikes and Impasse Resolution in Public Employment* (1969) 67 Mich.L.Rev. 943; Wellington & Winter, *The Limits of Collective Bargaining in Public Employment* (1969) 78 Yale L.J. 1107; Thorne, *The Government Employee and Organized Labor* (1962) 2 Santa Clara Law. 147; Note, *Labor Relations in the Public Service* (1961) 75 Harv.L.Rev. 391; Annot., Labor Law: Right of Public Employees to Strike or Engage in Work Stoppage (1971) 37 A.L.R.3d 1147.

[19]For example, in *City of Cleveland* v. *Division 268 of Amal. Ass'n* (1949) 41 Ohio Ops. 236, 239 [90 N.E.2d 711, 715], the court stated that "[i]t is clear that in our system of government, the government is a servant of all of the people. And a strike against the public, a strike of public employees, has been denominated . . . as a rebellion against government. The right to strike, if accorded to public employees . . . is one means of destroying gov-

particularly popular in the first half of the 20th century, when it received support from several American Presidents.[20]

The sovereignty concept, however, has often been criticized in recent years as a vague and outdated theory based on the assumption that "the King can do no wrong." As Judge Harry T. Edwards has cogently observed, "the application of the strict sovereignty notion—that governmental power can never be opposed by employee organizations—is clearly a vestige from another era, an era of unexpanded government . . . . With the rapid growth of the government, both in sheer size as well as in terms of assuming services not traditionally associated with the 'sovereign,' government employees understandably no longer feel constrained by a notion that 'The King can do no wrong.' The distraught cries by public unions of disparate treatment merely reflect the fact that, for all intents and purposes, public employees occupy essentially the same position vis a vis the employer as their private counterparts." (Edwards, *The Developing Labor Relations Law in the Public Sector* (1972) 10 Duq. L.Rev. 357, 359-360.)[21]

In recent years, courts have rejected the very same concept of sovereignty as a justification for governmental immunity from tort liability. In California, the death knell came in *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457], where this court stated that,

---

ernment. And if they destroy government, we have anarchy, we have chaos." A California case which relied on this sovereignty argument is *Nutter* v. *City of Santa Monica* (1946) 74 Cal.App.2d 292 [168 Cal.Rptr. 741].

[20]Commenting on the Boston police strike, Calvin Coolidge asserted that "[t]here is no right to strike against public safety by anybody, anywhere, at any time" (quoted in *Norwalk Teachers Ass'n* v. *Board of Education* (1951) 138 Conn. 269, 273 [83 A.2d 482, 484, 31 A.L.R.2d 1133]). Woodrow Wilson, commenting on the same strike, stated that the strike is "'an intolerable crime against civilization'" (quoted in *id.*, at p. 273 [83 A.2d at p. 484]).

In another famous pronouncement of the sovereignty argument, President Franklin Roosevelt stated: "'[M]ilitant tactics have no place in the functions of any organization of Government employees. . . . [A] strike of public employees manifests nothing less than an intent on their part to prevent or obstruct the operations of Government until their demands are satisfied. Such action, looking toward the paralysis of Government by those who have sworn to support it, is unthinkable and intolerable.'" (*Id.*, at pp. 273-274 [83 A.2d at p. 484] [quoting a letter from President Roosevelt to the president of the National Federation of Federal Employees (Aug. 16, 1937)].)

[21]See also *Anderson Fed. of Teach.* v. *School City of Anderson* (1969) 252 Ind. 588 [251 N.E. 2d 15, 20, 37 A.L.R.3d 1131] (dis. opn. of DeBruler, C. J.). ("[Sovereign immunity] is not a rational argument at all but a technique for avoiding dealing with the merits of the issue [of whether public employees may strike] . . . . The conflict of real social forces cannot be solved by the invocation of magical phrases like 'sovereignty.'")

Chief Justice DeBruler also notes that where the government has discretion over the terms and conditions of employment, "[a]ny decision within this discretionary area is authorized by the government, and therefore, obviously does not deny the authority of government." (*Id.*, at p. 20.)

"[t]he rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia." (55 Cal.2d at p. 216.) As noted by this court in *Muskopf,* perpetuation of the doctrine of sovereign immunity in tort law led to many inequities, and its application effected many incongruous results. Similarly, the use of this archaic concept to justify a per se prohibition against public employee strikes is inconsistent with modern social reality and should be hereafter laid to rest.

The second basic argument underlying the common law prohibition of public employee strikes holds that since the terms of public employment are fixed by the Legislature, public employers are virtually powerless to respond to strike pressure, or alternatively that allowing such strikes would result in "government by contract" instead of "government by law." (See *City of L.A.* v. *Los Angeles etc. Council* (1949) 94 Cal.App.2d 36, 46 [210 P.2d 305].) This justification may have had some merit before the California Legislature gave extensive bargaining rights to public employees. However, at present, most terms and conditions of public employment are arrived at through collective bargaining under such statutes as the MMBA.

We have already seen that the MMBA establishes a variety of rights and protections for public employees—including the right to join and participate in union activities and to meet and confer with employer representatives for the purpose of resolving disputed labor-management issues. The importance of mandating these rights, particularly the meet and confer requirement, cannot be ignored. The overall framework of the MMBA represents a nearly exact parallel to the private sector system of collective bargaining—a system which sets forth the guidelines for labor-management relations in the private sphere and which protects the right of private employees to strike. By enacting these significant and parallel protections for public employees through the MMBA, the Legislature effectively removed many of the underpinnings of the common law per se ban against public employee strikes. While the MMBA does not directly address the issue of such strikes, its implications regarding the traditional common law prohibition are significant.

This argument was eloquently explained by Justice Grodin in his concurring opinion in *El Rancho Unified Sch. Dist.* v. *National Education Assn.,* *supra,* 33 Cal.3d at page 963, where he pointed out that "[t]he premise underlying the court's opinion in *City of L.A.* [94 Cal.App.2d 36]—that it is necessarily contrary to public policy to establish terms and conditions of employment for public employees through the bilateral process of collective bargaining rather than through unilateral lawmaking—has since been rejected by the Legislature. The heart of the statute under consideration in

this case [the Educational Employment Relations Act], for example, contemplates that matters relating to wages, hours, and certain other terms and conditions of employment for teachers will be the subject of negotiation and agreement between a public school employer and organizations representing its employees. (Gov. Code, §§ 3543.2, 3543.3, 3543.7.) Thus, the original policy foundation for the 'rule' that public employee strikes are illegal in this state has been substantially undermined, if not obliterated."

The remaining two arguments have not served in this state as grounds for asserting a ban on public employee strikes but have been advanced by commentators and by courts of other states. With the traditional reasons for prohibiting such strikes debunked, these additional reasons do not convince us of the necessity of a judicial ukase prohibiting all such strikes.

The first of these arguments draws upon the different roles of market forces in the private and public spheres. This rationale suggests that because government services are essential and demand is generally inelastic, public employees would wield excessive bargaining power if allowed to strike. Proponents of this argument assume that economic constraints are not present to any meaningful degree in the public sector. Consequently, in the absence of such constraints, public employers will be forced to make abnormally large concessions to workers, which in turn will distort our political process by forcing either higher taxes or a redistribution of resources between government services.[22]

There are, however, several fundamental problems with this "distortion of the political process" argument. For one, as will be discussed more fully below, a key assumption underlying the argument—that all government services are essential—is factually unsupportable. Modern governments engage in an enormous number and variety of functions, which clearly vary as to their degree of essentiality. As such, the absence of an unavoidable nexus between most public services and essentiality necessarily undercuts the notion that public officials will be forced to settle strikes quickly and at any

---

[22]See e.g., *United Federation of Postal Clerks* v. *Blount, supra,* 325 F.Supp. 879, 884. ("In the private sphere, the strike is used to equalize bargaining power, but this has universally been held not to be appropriate when its object and purpose can only be to influence the essentially political decisions of Government in the allocation of its resources.")

For an even more extensive elaboration of this "distortion of the political process" argument, see Wellington & Winter, *The Limits of Collective Bargaining in Public Employment, supra,* 78 Yale L.J. 1107.

cost. The recent case of the air-traffic controllers' strike[23] is yet another example that governments have the ability to hold firm against a strike for a considerable period, even in the face of substantial inconvenience. As this court concluded in *Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen, supra,* "Permitting employees to strike does *not* delegate to them authority to fix their own wages to the exclusion of the employer's discretion. In collective bargaining negotiations, whether or not the employees strike, the employer is free to reject demands if he determines that they are unacceptable." (54 Cal.2d at p. 693, italics added.)

Other factors also serve to temper the potential bargaining power of striking public employees and thus enable public officials to resist excessive demands: First, wages lost due to strikes are as important to public employees as they are to private employees. Second, the public's concern over increasing tax rates will serve to prevent the decisionmaking process from being dominated by political instead of economic considerations. A third and related economic constraint arises in such areas as water, sewage and, in some instances, sanitation services, where explicit prices are charged. Even if representatives of groups other than employees and the employer do not formally enter the bargaining process, both union and local government representatives are aware of the economic implications of bargaining which leads to higher prices which are clearly visible to the public. A fourth economic constraint on public employees exists in those services where subcontracting to the private sector is a realistic alternative. For example, Warren, Michigan resolved a bargaining impasse with an American Federation of State, County and Municipal Employees (AFSCME) local by subcontracting its entire sanitation service; Santa Monica, California, ended a strike of city employees by threatening to subcontract its sanitation operations; in fact, San Francisco has chosen to subcontract its entire sanitation system to *private* firms. If this subcontract option is preserved, wages in the public sector clearly need not exceed the rate at which subcontracting becomes a realistic alternative.[24]

---

[23]In August 1981, the Professional Air Traffic Controllers Organization (PATCO) launched a nationwide strike against the federal government. President Ronald Reagan ordered the discharge of 11,000 striking controllers who had not returned to work within a two-day grace period. Up to the time of this writing, the Administration has rejected all suggestions for a general amnesty, its position being that the strikers, by violating the federal government's prohibition on strikes and their own "no-strike" oath, have forfeited their jobs with the Federal Aviation Administration forever. Federal courts upheld the government's position in *PATCO* v. *Federal Labor Relations Authority* (D.C. Cir. 1982) 685 F.2d 547. For a more detailed analysis of the strike, see Meltzer & Sunstein, *Public Employee Strikes, Executive Discretion, and the Air Traffic Controllers* (1983) 50 U.Chi.L.Rev. 731.

[24]See further discussion in Burton & Krider, *The Role and Consequences of Strikes by Public Employees, supra,* 79 Yale L.J. 418, 425-427.

The proponents of a flat ban on public employee strikes not only ignore such factors as the availability of subcontracting, but also fail to adequately consider public sentiment towards most strikes and assume that the public will push blindly for an early resolution at any cost. In fact, public sentiment toward a strike often limits the pressure felt by political leaders, thereby reducing the strike's effectiveness. A Pennsylvania Governor's Commission Report stressed just such public sentiment as an important reason to *grant* a limited right to strike: "[T]he limitations on the right to strike which we propose . . . will appeal to the general public as so much fairer than a general ban on strikes that the public will be less likely to tolerate strikes beyond these boundaries. Strikes can only be effective so long as they have public support. *In short, we look upon the limited and carefully defined right to strike as a safety valve that will in fact prevent strikes.*"[25] (Italics in original.)

In sum, there is little, if any empirical evidence which demonstrates that governments generally capitulate to unreasonable demands by public employees in order to resolve strikes. The result of the strike in the instant case clearly suggests the opposite. During the 11-day strike, negotiations resumed, and the parties subsequently reached an agreement on a new MOU, the terms of which were *precisely the same* as the District's last offer prior to the commencement of the strike. Such results certainly do not illustrate a situation where public employees wielded excessive bargaining power and thereby caused a distortion of our political process.

The fourth and final justification for the common law prohibition is that interruption of government services is unacceptable because they are essential. As noted above, in our contemporary industrial society the presumption of essentiality of most government services is questionable at best. In addition, we tolerate strikes by private employees in many of the same areas in which government is engaged, such as transportation, health, education, and utilities; in many employment fields, public and private activity largely overlap.

In a dissenting opinion in *Anderson Fed. of Teach.* v. *School City of Anderson, supra,* Chief Justice DeBruler of Indiana observed that the source and management of most service enterprises is irrelevant to the relative essentiality of the services: "There is no difference in impact on the community between a strike by employees of a public utility and employees of

---

[25]Governor's Commission to Revise the Public Employee Law of Pennsylvania, Report and Recommendations, reprinted in 251 Gov. Empl. Rel. Rep. (BNA) E-1, E-3 (1968). This report is discussed in detail in Hanslowe & Acierno, *The Law and Theory of Strikes by Government Employees, supra,* 67 Cornell L.Rev. 1055.

a private utility; nor between employees of a municipal bus company and a privately owned bus company; nor between public school teachers and parochial school teachers. The form of ownership and management of the enterprise does not determine the amount of destruction caused by a strike of the employees of that enterprise. In addition, the form of ownership that is actually employed is often a political and historical accident, subject to future change by political forces. Services that were once rendered by public enterprise may be contracted out to private enterprise, and then by another administration returned to the public sector." (251 N.E.2d at p. 21.)

Recently, the United States Supreme Court also eschewed the classic equation of public ownership of an industry with the essentiality of that industry. In an earlier case which reflected the traditional reasoning, *United States* v. *Mineworkers* (1947) 330 U.S. 258 [91 L.Ed. 884, 67 S.Ct. 677], the Supreme Court had held that the government's wartime seizure of private coal mines rendered those mining operations public services and changed the rights of the miners, though the function of the mines remained exactly the same. The court then approved the issuance of an injunction against striking workers, a remedy that would not have been available had the mines still been considered a private enterprise.

In the recent case of *Transportation Union* v. *Long Island R. Co.* (1982) 455 U.S. 678 [71 L.Ed.2d 547, 102 S.Ct. 1349], however, the court held that employees of a formerly private railroad, which had recently been acquired by a governmental entity, retained their right to strike under the Railway Labor Act. In this latter instance, the Supreme Court clearly recognized that the public takeover of the railroad did not necessarily change the rights of the employees; the court therefore suggested that the railroad became no more essential after its public acquisition. Although the decision's basis in the supremacy clause limits its direct precedential value on labor law, the ruling nevertheless signifies a major departure from the court's earlier holding in *Mineworkers, supra*—that a service becomes essential once it comes under government control. The *Transportation Union* case thus underscores the conclusion that it is *the nature of the service provided* which determines its essentiality and the impact of its disruption on the public welfare, as opposed to a simplistic determination of whether the service is provided by public or private employees. Indeed, strikes by private workers often pose a more serious threat to the public interest than would many of those which involve public employees.

We of course recognize that there are certain "essential" public services, the disruption of which would seriously threaten the public health or safety. In fact, defendant union itself concedes that the law should still act to render

illegal any strikes in truly essential services which would constitute a genuine threat to the public welfare. Therefore, to the extent that the "excessive bargaining power" and "interruption of essential services" arguments still have merit, specific health and safety limitations on the right to strike should suffice to answer the concerns underlying those arguments.

In addition to the various legal arguments advanced to persuade the courts to impose a judicial ban on public employee strikes—arguments which, as we have seen, are decidedly unpersuasive in the context of modern jurisprudence and experience—there is the broader concern that permitting public employees to strike may be, on balance, harmful to labor-management relations in the public sector. This is essentially a political argument, best addressed to the Legislature. We review the matter only to point out that the issue is not so clear cut as to justify judicial intervention, since the Legislature could reasonably conclude that recognizing public employees' right to strike may actually enhance labor-management relations.

At least 11 states have granted most of their public employees a right to strike;[26] and the policy rationale behind this statutory recognition further undercuts several of the basic premises relied upon by strike-ban advocates. As the aforementioned Pennsylvania Governor's Commission Report concluded: "The collective bargaining process will be strengthened if this qualified right to strike is recognized. It will be some curb on the possible intransigence of an employer; and the limitations on the right to strike will serve notice on the employee that there are limits to the hardships that he can impose." (251 Gov. Empl. Rel. Rep., *supra,* at p. E-3.)

It is unrealistic to assume that disputes among public employees and their employers will not occur; in fact, strikes by public employees are relatively frequent events in California. For example, 46 strikes occurred during 1981-1983, which actually marks a significant decline when compared to the number during the 5 previous years.[27] Although the circumstances be-

---

[26]See footnote 8, *ante,* for a list of the 11 states. Typically these statutes permit public sector strikes, unless such strikes endanger the public health, safety, or welfare. The statutes generally prohibit strikes by police and fire-protection employees, employees in correctional facilities, and those in health-care institutions. In some instances, statutes provide binding arbitration to resolve certain disputes for which strikes are proscribed. Thus, the public sector strike has begun to achieve some degree of legitimacy, despite the strong opposition of critics.

[27]Public employee strikes in California, 1970-1983:*

| 1970 | 1971 | 1972 | 1973 | 1974 | 1975 | 1976 |
|------|------|------|------|------|------|------|
| 20 | 14 | 18 | 15 | 45 | 44 | 23 |

| 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 |
|------|------|------|------|------|------|------|
| 59 | 29 | 87 | 55 | 20 | 6 | 20 |

*Source: *An Analysis of 1981-1983 Strikes in California's Public Sector* (1984) (Mar.

hind each individual strike may vary somewhat, commentators repeatedly note that much of the reason for their occurrence lies in the fact that without the right to strike, or at least a credible strike threat, public employees have little negotiating strength. This, in turn, produces frustrations which exacerbate labor-management conflicts and often provoke "illegal" strikes.

The noted labor mediator, Theodore W. Kheel, aptly described this process when analyzing New York's Taylor Law (which makes all public employee strikes illegal) and its resultant effect on labor relations in that state: "It would be unfair to place upon the legal machinery sole responsibility for these interruptions of critical services on which the welfare of New York depends. But the fact remains that the machinery—including the prohibition on strikes with attendant penalties and the fact-finding boards with their power to make recommendations—did not work to settle these disputes or stop the strikes, slowdowns, or threats. In fact it is probable that the Taylor Law exacerbated these conflicts. For one thing, it made subversive a form of conduct society endorsed for private workers. It encouraged unions to threaten to strike to achieve the bargaining position participants in collective bargaining must possess. It made the march to jail a martyr's procession and a badge of honor for union leaders. . . . In simple point of fact, it did not and is not likely to work as a mechanism for resolving conflicts in public employment relations through joint determination, whether called collective bargaining or collective negotiations." (Kheel, *Strikes and Public Employment, supra,* 67 Mich.L.Rev. 931, 936.)[28]

---

1984 Inst. of Ind. Rel., U.C. Berkeley) 60 Cal. Pub. Empl. Rel. 7, 9. Public employees include all workers in public agencies in California, excluding federal service and public utilities.

[28]Indeed the per se prohibition is notoriously ineffective. See Comment, *California Assembly Advisory Council's Recommendations on Impasse Resolution Procedures and Public Employee Strikes, supra,* 11 San Diego L.Rev. 473, 480. The council's study found that the "present laws do not deter strikes, and furthermore, that once an illegal strike is instituted the law has very little effect in compelling the strikers to return to work. Part of the reason for this is that many public employers hesitate to request an injunction because they believe that the employees would continue to strike, thereby forcing the employer to either initiate contempt proceedings and subject his employees to quasi-criminal penalties, or stand idly and ineffectually by as the illegal strike continues. Either of these alternatives, if pursued, would have a deleterious effect on future employee-management relations once the strike is settled."

See also statement of Professor Reginald Alleyne, UCLA Law School, in the Transcript of Proceedings, MMBA Hearing, California Legislative Assembly, Interim Public Employment and Retirement Committee, page 20. Professor Alleyne cited statistics which supported his view that "In 99 and %0 of the cases in the private sector they succeed and reach an agreement."

See also Cebulski, *An Analysis of 22 Illegal Strikes and California Law* (1973) 18 Cal. Pub. Empl. Rel. 2, 9 (chart showing that strikes in which public sector employers imposed legal sanctions lasted *twice as long* as strikes in which the employers did not attempt to impose sanctions).

It is universally recognized that in the private sector, the bilateral determination of wages and working conditions through a collective bargaining process, in which both sides possess relatively equal strength, facilitates understanding and more harmonious relations between employers and their employees. In the absence of some means of equalizing the parties' respective bargaining positions, such as a credible strike threat, both sides are less likely to bargain in good faith;[29] this in turn leads to unsatisfactory and acrimonious labor relations and ironically to more and longer strikes. Equally as important, the possibility of a strike often provides the best impetus for parties to reach an agreement at the bargaining table, because *both* parties lose if a strike actually comes to pass. Thus by providing a clear incentive for resolving disputes, a credible strike threat may serve to avert, rather than to encourage, work stoppages.

Theodore Kheel has explained this argument very well: "[W]e should acknowledge the failure of unilateral determination, and turn instead to true collective bargaining, even though this must include the possibility of a strike. We would then clearly understand that we must seek to improve the bargaining process and the skill of the negotiators to prevent strikes. . . . With skillful and responsible negotiators, no machinery, no outsiders, and no fixed rules are needed to settle disputes. For too long our attention has been directed to the mechanics and penalties rather than to the participants in the process. It is now time to change that, to seek to prevent strikes by encouraging collective bargaining to the fullest extent possible."[30]

A final policy consideration in our analysis addresses a more philosophical issue—the perception that the right to strike, in the public sector as well as in the private sector, represents a basic civil liberty.[31] The widespread ac-

---

[29]See, e.g., *Timberlane Reg. Sch. Dist.* v. *Timberlane Reg. Ed. Ass'n* (1974) 114 N.H. 245 [317 A.2d 555, 557].

[30]Kheel, *op. cit. supra,* 67 Mich.L.Rev. at pages 940-941.

[31]Another interesting and related policy argument in support of granting a right to strike to public employees rests on a recognition of the changing shape and values of the American economic system itself. In essence, it focuses on the fact that our market economy has evolved from its classical model into an increasingly mixed and pluralistic form. In this process of increased government intervention, the line between public and private enterprise has become increasingly blurred. At the same time, a concomitant blurring has occurred between traditional political and economic activity, and it is this latter overlap which renders a flat ban on all public sector strikes so difficult to defend.

The argument then analogizes the deviation of the American system from classical economic models and the corresponding reevaluation of public strike prohibitions to the Solidarity-inspired developments in Poland prior to the latest military crackdown. Ironically, the traditional common law argument that public sector bargaining and striking is antidemocratic and inimical to our political process, closely mirrors the Polish government's view that unions and strikes are antisocial—indeed revisionist and reactionary—conduct in a system operated purportedly for the benefit of all. Deviations from classical models and

ceptance of that perception leads logically to the conclusion that the right to strike, as an important symbol of a free society, should not be denied unless such a strike would substantially injure paramount interests of the larger community.

██ Plaintiff's argument that only the Legislature can reject the common law doctrine prohibiting public employee strikes flies squarely in the face of both logic and past precedent. Legislative silence is not the equivalent of positive legislation and does not preclude judicial reevaluation of common law doctrine. If the courts have created a bad rule or an outmoded one, the courts can change it.

This court has long recognized the need to redefine, modify or even abolish a common law rule "when reason or equity demand it" or when its underlying principles are no longer justifiable in light of modern society. (See *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 394 [115 Cal.Rptr. 765, 525 P.2d 669]; *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 216 [11 Cal.Rptr. 89, 359 P.2d 457]; *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 629 [111 Cal.Rptr. 704, 517 P.2d 1168]; *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 808 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].)

This court's history provides numerous examples of this principle. In *Li* v. *Yellow Cab Co., supra,* 13 Cal.3d at page 812, when this court first adopted a rule of comparative negligence, we expressly rejected the contention that any change in the law of contributory negligence was exclusively a matter for the Legislature, and overturned more than a century of precedent. In *Rodriguez* v. *Bethlehem Steel Corp., supra,* 12 Cal.3d 382, we directly repudiated the assertion that recognition of a spousal action for loss of consortium required legislative action (see pp. 393-395) and reversed numerous prior decisions in endorsing that cause of action. ██ Furthermore, "[w]hen the law governing a subject has been shaped and guided by judicial decision, legislative inaction does not necessarily constitute a tacit endorsement of the precise stage in the evolution of the law extant at the time when the Legislature did nothing; it may signify that the Legislature is willing to entrust the further evolution of legal doctrine to judicial devel-

beliefs thus confront both ideological viewpoints. The argument for a right to strike for public employees in a capitalist system clearly gains strength as society evolves away from the classical ideal of a pure market economy where the public and private sectors are clearly separated. Similarly, the case for a right to strike in a socialist system grows stronger as that society deviates from the classical ideals of the socialist model. For a more detailed analysis of this theory, see Hanslowe & Acierno, *supra,* 67 Cornell L.Rev. at pages 1072-1073.

opment." (*People* v. *Drew* (1978) 22 Cal.3d 333, 347, fn. 11 [149 Cal.Rptr. 275, 583 P.2d 1318].)

For the reasons stated above, we conclude that the common law prohibition against public sector strikes should not be recognized in this state. Consequently, strikes by public sector employees in this state as such are neither illegal nor tortious under California common law. We must immediately caution, however, that the right of public employees to strike is by no means unlimited. Prudence and concern for the general public welfare require certain restrictions.

The Legislature has already prohibited strikes by firefighters under any circumstance. It may conclude that other categories of public employees perform such essential services that a strike would invariably result in imminent danger to public health and safety, and must therefore be prohibited.[32]

While the Legislature may enact such specific restrictions, the courts must proceed on a case-by-case basis. Certain existing statutory standards may properly guide them in this task. As noted above, a number of states have granted public employees a limited right to strike, and such legislation typically prohibits strikes by a limited number of employees involved in clearly essential services. In addition, several statutes provide for injunctive relief against other types of striking public employees when the state clearly demonstrates that the continuation of such strikes will constitute an imminent threat or "clear and present danger" to public health and safety.[33] Such an

[32]See, e.g., Minnesota Statutes Annotated section 179.63(11) (1981) (firefighters, peace officers, guards at correctional facilities), Oregon Revised Statutes section 243.736 (1979) (firefighters, police officers and guards at correctional or mental health institutions); Pennsylvania Statutes Annotated, title 43, section 1101.1001 (guards at correctional or mental health institutions and employees necessary to the functioning of the courts). For a further discussion of these provisions, see Hanslowe & Acierno, *The Law and Theory of Strike by Government Employees, supra,* 67 Cornell L.Rev. 1055, 1079-1083.

See also Burton & Kinder, *supra,* 79 Yale L.J. at page 437 (advocating a presumption of illegality in strikes involving truly essential services, thereby relieving the state of the burden to demonstrate the elements necessary for an injunction).

[33]See, e.g., Alaska Statutes section 23.40.200(c) (strikes by most public employees may not be enjoined unless it can be shown that it has begun to threaten the health, safety and welfare of the public); Oregon Revised Statutes section 243.726(3)(a) (injunctive relief available when strike creates a clear and present danger or threat to the health, safety or welfare of the public); Pennsylvania Statutes Annotated, title 43, section 1101.1003 (injunctive relief available when strike creates a clear and present danger or threats to the health, safety or welfare of the public); Wisconsin Statutes Annotated section 111.70(7m)(b) (injunctive relief available if strike poses an imminent threat to the public health or safety). See also *School District for City of Holland* v. *Holland Educ. Ass'n* (1968) 348 Mich. 314 [157 N.W.2d 206, 210] (Mich. Supreme Ct., in teachers strike cases, declaring state's policy is not "to issue injunctions in labor disputes absent a showing of violence, irreparable injury, or breach

approach guarantees that essential public services will not be disrupted so as to genuinely threaten public health and safety, while also preserving the basic rights of public employees.

After consideration of the various alternatives before us, we believe the following standard may properly guide courts in the resolution of future disputes in this area: strikes by public employees are not unlawful at common law unless or until it is clearly demonstrated that such a strike creates a substantial and imminent threat to the health or safety of the public. This standard allows exceptions in certain essential areas of public employment (e.g., the prohibition against firefighters and law enforcement personnel) and also requires the courts to determine on a case-by-case basis whether the public interest overrides the basic right to strike.

Although we recognize that this balancing process may impose an additional burden on the judiciary, it is neither a novel nor unmanageable task.[34] Indeed, an examination of the strike in the instant case affords a good example of how this new standard should be applied. The 11-day strike did not involve public employees, such as firefighters or law enforcement per-

---

of the peace"); *Timberlane Reg. Sch. Dist.* v. *Timberlane Reg. Ed. Ass'n* (1974) 114 N.H. 245 [317 A.2d 555, 559] (N.H. Supreme Ct. refused to rule on the legality of teachers' strikes but stated that in determining whether to issue a strike injunction, a court should consider "whether the public health, safety and welfare will be substantially harmed if the strike is allowed to continue."). The Federal Labor Management Relations Act of 1947 (29 U.S.C. §§ 141-187), follows a similar approach with respect to private sector strikes. It empowers the President to direct the Attorney General to enjoin a threatened or actual strike if it affects an industry involved in interstate commerce and if permitted to occur or continue would imperil the national health or safety. (29 U.S.C. §§ 176-180.)

[34]Legislation in several states already requires the courts to make this precise determination. (See, e.g., the relevant statutory provisions in Alaska, Ore., Pa. and Wis.) For just one example, under the Pennsylvania Public Employee Relations Act, public employees are not prohibited from striking after they have submitted to mediation and fact finding, unless or until such a strike creates a clear and present danger or threat to the health, safety and welfare of the public. (Pa. Stat. Ann., tit. 43, § 1101.1003.) In such cases, the employer may petition for equitable relief, including injunctions, and is entitled to relief if the court finds that the strike creates the danger or threat. (*Id.*) The Pennsylvania courts have applied this standard to several classes of public employees. (See, e.g., *Bethel Park Sch.* v. *Bethel Park Fed. of Tchrs. 1607, Am. Fed'n of Teachers* (1980) 54 P. Commw. 49, 52 [420 A.2d 18] (teacher's strike constituted a clear and present danger to the public's health, safety and welfare and school district entitled to back-to-work order in view of potential losses of state subsidies, instructional days vocational job, higher education opportunities, counseling, social and health services, extracurricular enrichment programs and employees' work opportunities and wages); *Bristol Township Education Ass'n* v. *School District* (1974) 14 Pa. Commw. 463, 468-470 [322 A.2d 767] (school district entitled to injunction against teacher's strike under similar circumstances); *Highland Sewer and Water Auth.* v. *Local Union 459, I.B.E.W.* (1973) 67 Pa. D. & C.2d 564, 565-567 (sewer and water authority not entitled to injunction forcing striking employees back to work since there was no clear and present danger in view of the fact that the services provided by the authority could still be performed during the strike, apparently by supervisors, with relatively little inconvenience).

sonnel, whose absence from their duties would clearly endanger the public health and safety. Moreover, there was no showing by the District that the health and safety of the public was at any time imminently threatened. That is not to say that had the strike continued indefinitely, or had the availability of replacement personnel been insufficient to maintain a reasonable sanitation system, there could not have been at some point a clear showing of a substantial threat to the public health and welfare.[35] However, such was not the case here, and the legality of the strike would have been upheld under our newly adopted standard.[36]

Defendant union has also urged this court to find that a per se prohibition of all public employee strikes violates the California Constitution's guarantees of freedom of association, free speech, and equal protection. They do not contend that such a constitutional infringement is present when a court exercises its equitable authority to enjoin a strike based on a showing that the strike represents a substantial and imminent danger to the public health or safety. Instead, the union argues that in the absence of such a showing, per se prohibition is constitutionally unsupportable.

The right to form and be represented by unions is a fundamental right of American workers that has been extended to public employees through constitutional adjudication[37] as well as by statute; in this case, it is

---

[35]Had such a showing been made, the trial court would then have had the authority to issue an injunction and declare the strike illegal. In cases involving sanitation strikes, it is often the *length* of the strike which will ultimately require issuance of an injunction. (See, e.g., *Highland Sewer and Water Auth.* v. *Local Union 459, I.B.E.W., supra,* 67 Pa. D. & C.2d 564, 565-567.) In addition, if particular jobs performed by striking sanitation or other public employees require unique skills and training, it is conceivable that a public agency might be unable to find adequate replacements. In the instant matter, however, replacement personnel adequately maintained needed sanitation services without any significant threat of harm to the public. Further, the District's allegations of vandalism by the strikers (see fn. 4, *ante*), while perhaps citing individual illegal acts, were by no means enough to render the entire strike illegal or even a substantial public threat.

[36]The trial court in this matter had no reason to make a finding regarding the threat to public health and safety posed by the strike. The court merely relied on prior Court of Appeal opinions, which had held that public employee strikes were per se illegal in the absence of a specific statutory grant. In the future, trial courts will clearly be required to make such a finding. In these cases, the scope of appellate review will ordinarily be limited to determining whether reasonable grounds existed for the trial court's decision.

[37]In upholding the National Labor Relations Act against constitutional attack, the United States Supreme Court recognized that the right of employees to organize for the purpose of collective bargaining is fundamental. (*Labor Board* v. *Jones & Laughlin* (1937) 301 U.S. 1, 33 [81 L.Ed. 893, 909, 57 S.Ct. 615, 108 A.L.R. 1352].)

It is also axiomatic that employees form and join labor organizations to protect their interests in labor disputes, and the United States Supreme Court has long recognized that "[i]n the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. [Citations.]" (*Thornhill* v. *Alabama* (1940) 310 U.S. 88, 102 [84 L.Ed.

specifically mandated by the provisions of the MMBA itself. ■ In addition, " '[i]t is now settled law that workmen may lawfully combine to exert various forms of economic pressure upon an employer, provided the object sought to be accomplished thereby has a reasonable relation to the betterment of labor conditions, and they act peaceably and honestly. (Citations) This right is guaranteed by the federal Constitution as an incident of freedom of speech, press and assemblage, (citations) and it is not dependent upon the existence of a labor controversy between the employer and his employee.' " (*In re Blaney* (1947) 30 Cal.2d 643, 648 [184 P.2d 892], quoting *Steiner* v. *Long Beach Local No. 128* (1942) 19 Cal.2d 676, 682 [123 P.2d 20].)

As the union contends, however, the right to unionize means little unless it is accorded some degree of protection regarding its principal aim—effective collective bargaining. For such bargaining to be meaningful, employee groups must maintain the ability to apply pressure or at least threaten its application. A creditable right to strike is one means of doing so. As yet, however, the right to strike has not been accorded full constitutional protection, the prevailing view being that "[t]he right to strike, because of its more serious impact upon the public interest, is more vulnerable to regulation than the right to organize and select representatives for lawful purposes of collective bargaining which this Court has characterized as a 'fundamental right . . . .' " (*Auto. Workers* v. *Wis. Board* (1949) 336 U.S. 245, 259 [93 L.Ed. 651, 666, 69 S.Ct. 516].)

Further, the federal ban on public employee strikes has been specifically upheld as constitutionally permissible. (See *United Federation of Postal Clerks* v. *Blount, supra,* 325 F.Supp. 879, 884; affd. (1971) 404 U.S. 802

1093, 1102, 60 S.Ct. 736].) In addition, whenever a labor organization undertakes a concerted activity, its members exercise their right to assemble, and organizational activity has been held to be a lawful exercise of that right. (*Thomas* v. *Collins* (1945) 323 U.S. 516 [89 L.Ed. 430, 65 S.Ct. 315].)

The freedoms of speech and assembly are applicable to the states through the Fourteenth Amendment (*Hague* v. *C. I. O.* (1939) 307 U.S. 496 [83 L.Ed. 1493, 59 S.Ct. 954]), and may be exercised in an economic context. As explained by the United States Supreme Court in *N.A.A.C.P.* v. *Alabama*: "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. [Citations.] It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. [Citations.] Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." (*N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. 449, 460 [2 L.Ed.2d 1488, 1498, 78 S.Ct. 1163].)

[30 L.Ed.2d 38, 92 S.Ct. 80].) In the absence of any explicit constitutional protection of the right to strike, the *Blount* court reasoned that the law prohibiting only public employees from striking need only have a rational basis to avoid offending constitutional guarantees. The court then easily found that the common law policy justifications (discussed in detail above) did indeed provide a rational basis for the per se prohibition. (See, *United Federation of Postal Clerks* v. *Blount, supra,* at p. 883.)

Thoughtful judges and commentators, however, have questioned the wisdom of upholding a per se prohibition of public employee strikes. They have persuasively argued that because the right to strike is so inextricably intertwined with the recognized fundamental right to organize and collectively bargain, some degree of constitutional protection should be extended to the act of striking in both the public and private sectors.

As Judge J. Skelly Wright declared in his concurrence in *United Federation of Postal Clerks* v. *Blount, supra,* "[i]f the inherent purpose of a labor organization is to bring the workers' interests to bear on management, the right to strike is, historically and practically, an important means of effectuating that purpose. A union that never strikes, or which can make no credible threat to strike, may wither away in ineffectiveness. That fact is not irrelevant to the constitutional calculations. Indeed, in several decisions, the Supreme Court has held that the First Amendment right of association is at least concerned with essential organizational activities which give the particular association life and promote its fundamental purposes. . . . [Citations.] I do not suggest that the right to strike is co-equal with the right to form labor organizations. . . . But I do believe that the right to strike is, at least, within constitutional concern and should not be discriminatorily abridged without substantial or 'compelling' justification." (325 F.Supp. 879, 885.)

Chief Justice Roberts of the Rhode Island Supreme Court offered similar sentiments in a case involving a teachers' strike in that state: "Obviously, the right to strike is essential to the viability of a labor union, and a union which can make no credible threat of strike cannot survive the pressures in the present-day industrial world. If the right to strike is fundamental to the existence of a labor union, that right must be subsumed in the right to organize and bargain collectively. . . . The collective bargaining process, if it does not include a constitutionally protected right to strike, would be little more than an exercise in sterile ritualism. . . . I cannot agree that every strike by public employees necessarily threatens the public welfare and governmental paralysis. . . . The fact is that in many instances strikes by private employees pose the far more serious threat to the public interest

than would many of those engaged in by public employees. . . . In short, it appears to me that to deny all public employees the right to strike because they are employed in the public sector would be arbitrary and unreasonable." (*School Committee* v. *Westerly Teachers Ass'n* (1973) Ill R.I. 96 [299 A.2d 441, 447-449], dis. opn.)

We are not persuaded that the personal freedoms guaranteed by the United States and California Constitutions confer an *absolute right* to strike,[38] but the arguments above may merit consideration at some future date. If the right to strike is afforded some constitutional protection as derivative of the fundamental right of freedom of association, then this right cannot be abridged absent a substantial or compelling justification.

 As this court stated in *Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18, 22 [64 Cal.Rptr. 409, 434 P.2d 961], which invalidated a loyalty oath requirement for public employees in this state, "even where a compelling state purpose is present, restrictions on the cherished freedom of association protected by the First Amendment and made applicable to the states by the Fourteenth Amendment must be drawn with narrow specificity. First Amendment freedoms are delicate and vulnerable and must be protected wherever possible. When government seeks to limit those freedoms on the basis of legitimate and substantial governmental purposes . . . those purposes cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. Precision of regulation is required so that the exercise of our most precious freedoms will not be unduly curtailed except to the extent necessitated by the legitimate governmental objective. (*Keyishian* v. *Board of Regents, supra,* 385 U.S. 589, 602-603; *Elfbrandt* v. *Russell,* 384 U.S. 11, 15, *et seq.; N.A.A.C.P.* v. *Button,* 371 U.S. 415, 432-433; *Shelton* v. *Tucker,* 364 U.S. 479, 488; *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499, 506-509; *Fort* v. *Civil Service Com., supra,* 61 Cal.2d 331, 337-338.)"

 As discussed at length above, the traditional justifications espoused in favor of a per se prohibition cannot withstand a significant degree of judicial scrutiny. Indeed, since not all public employee services are essential and many private employees perform services more vital to the public health

---

[38]As stated in the United States Supreme Court in *Dorchy* v. *Kansas*: "Neither the common law nor the Fourteenth Amendment confers the absolute right to strike." (*Dorchy* v. *Kansas* (1926) 272 U.S. 306, 311 [71 L.Ed. 248, 269, 47 S.Ct. 86].) Similarly, we do not find that the comparable personal freedoms guaranteed by the California Constitution confer an absolute right to strike. (See, e.g., *In re Porterfield* (1946) 28 Cal.2d 91, 114 [168 P.2d 706, 167 A.L.R. 675].)

and safety than do their counterparts in the public sector, the simplistic public/private dichotomy does not constitute a "compelling" justification for a per se prohibition of public employee strikes. Thus the constitutional arguments of defendant union and several amici cannot easily be dismissed, particularly since we will retain the limitation that public strikes may be prohibited when they threaten the public health or safety.[39]

Since we have already concluded that the traditional per se prohibition against public employee strikes can no longer be upheld on common law grounds, we do not find it necessary to reach the issue in constitutional terms. Although we are not inclined to hold that the right to strike rises to the magnitude of a fundamental right, it does appear that associational rights are implicated to a substantial degree. As such, the close connection between striking and other constitutionally protected activity adds further weight to our rejection of the traditional common law rationales underlying the per se prohibition. (Cf. *Environmental Planning & Information Council*

---

[39]Contrary to the characterization of our dissenting colleague, we neither applaud nor disapprove of strikes by public employees as a matter of social policy, for in the present state of the law that is not our function. The old rule in this state, to the effect that strikes by public employees are unlawful, rested expressly upon the premise that wages and conditions of employment for public employees may only be set by unilateral action of the public employer, and that collective bargaining for such employees in itself was contrary to public policy. *It is the Legislature which has removed the underpinnings from the old rule, by sanctioning a system of collective bargaining for local government employees.* At the same time, the Legislature has maintained a stony silence regarding the status of public employee strikes under the new statutory scheme. To the extent that we examine alternative justifications which have been asserted in support of a ban on such strikes, we do so only to determine whether there are any such justifications which are so compelling as to require acceptance by the courts even in the absence of legislative action. We find an affirmative answer only as regards those strikes which imperil public health or safety. As to other strikes, we conclude that the policy questions involved are highly debatable, and best left to the legislative branch in the first instance.

We find nothing in the dissenting opinion which detracts from this logic. The "cogent analysis" upon which the dissent relies for "the various rationales underlying the 'no strike' rule" (*post*, p. 610) refers nakedly to "differences in the employment relationship" between public and private sectors, and to "the preservation of a system of government in the ambit of public employment and the proscription of practices not compatible with the public employer-employee relationship." (*Id.*, at p. 611.) What the significant differences are which require a different rule, or why strikes are incompatible with the employer-employee relationship in the public sector, we are not told. Surely judicial intervention in so complex an arena requires greater justification than that.

The dissent decries also what it perceives to be the ambiguity in our rule prohibiting strikes which threaten public safety or health, and states a preference for those statutes which clearly define classes of employees who may or may not strike. The formulation we have adopted, however, is in accord with the rule in several states (*ante*, p. 585), and the dissent points to no evidence that such a rule is incapable of effective judicial administration. On the contrary, such a rule, which depends upon an assessment of public detriment from a particular strike, is entirely in accord with the traditional role of courts in equity. If the Legislature wishes to adopt a different rule, of course it may do so.

v. *Superior Court* (1984) 36 Cal.3d 188, 195 [203 Cal.Rptr. 127, 680 P.2d 1086].)

 We conclude that it is not unlawful for public employees to engage in a concerted work stoppage for the purpose of improving their wages or conditions of employment, unless it has been determined that the work stoppage poses an imminent threat to public health or safety. Since the trial court's judgment for damage in this case was predicated upon an erroneous determination that defendants' strike was unlawful, the judgment for damages cannot be sustained.[40]

The judgment is reversed.

Mosk, J., and Grodin, J., concurred.

**KAUS, J.**—I concur in the judgment insofar as it holds that a peaceful strike by public employees does not give rise to a tort action for damages against the union. I am aware of nothing in the Meyers-Milias-Brown Act which suggests that the Legislature intended that common law tort remedies should be applied in this context, and without such legislative endorsement I believe it is improper to import tort remedies that were devised for different situations into this sensitive labor relations arena. As this court noted in *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 917 [120 Cal.Rptr. 707, 534 P.2d 403]: "The question as to what sanctions should appropriately be imposed on public employees who engage in illegal strike activity is a complex one which, in itself, raises significant issues of public policy. In the past, several states have attempted to deter public employee strikes by imposing mandatory draconian statutory sanctions on striking employees; experience has all too frequently demonstrated, however, that such harsh, automatic sanctions do not prevent strikes but instead are counterproductive, exacerbating employer-employee friction and prolonging work stoppages." In the absence of a determination by the Legislature that a tort action, resulting in a money damage award determined by a jury many years after the strike, is the appropriate method for dealing with public employee strikes, I do not believe the judiciary should, on its own, embrace this "solution" to the problem. (See, e.g., *Lamphere Sch.* v. *Lamphere Fed. of Teachers* (1977) 400 Mich. 104 [252 N.W.2d 818, 827-832, 84 A.L.R.3d 314]; *City of Fairmont* v. *Retail, Wholesale, etc.* (W.Va. 1980) 283 S.E.2d 589, 592-595; contra *State* v. *Kansas City Firefighting Local 42*

---

[40]The trial court relied upon *Pasadena Unified Sch. Dist.* v. *Pasadena Federation of Teachers* (1977) 72 Cal.App.3d 100 [140 Cal.Rptr. 41], which held that the conduct of an illegal strike was a tort for which damages may be recovered. Since we have held that the strike in this case was not illegal, we need not consider the correctness of that decision.

(Mo.App. 1984) 672 S.W.2d 99, 107-116.) I would therefore disapprove the contrary holding in *Pasadena Unified Sch. Dist.* v. *Pasadena Federation of Teachers* (1977) 72 Cal.App.3d 100, 111-114 [140 Cal.Rptr. 41].

In concluding that a common law tort action does not lie in these circumstances, it is not necessary to determine whether such a strike is "legal" or "illegal" in an abstract sense, or whether, and under what circumstances, such a strike could properly be enjoined. The question of injunctive relief presents significantly different considerations than the propriety of a tort action, and it is not before us in this case. We should await the facts of a concrete dispute before we attempt to resolve it.

Finally, I believe it is equally unwise to venture an opinion on potential constitutional challenges to future legislative action in this field. In my view, we should—if anything—be encouraging the Legislature to attempt to deal with the difficult public policy questions in this area, not frightening it away with premature warnings of possible constitutional minefields.

Reynoso, J., concurred.

**BIRD, C. J.,** Concurring.— ■■■■■■■■■ ■ I write separately because I believe it is only fair to give the Legislature some guidance in an area filled with constitutional problems. To prompt the Legislature to enter this field without such guidance[1] not only invites error but encourages it. Such a practice is not only disingenuous, it is disrespectful to the litigants and knowingly misleads the public.

Today's decision brings the law of public employee strikes into the 20th century and makes the common law contemporary. As the court has explained, the flat prohibition against such strikes was grounded in outmoded notions of sovereignty and unreasoned fears of free labor organization.

It is appropriate that today's affirmation of the right to strike should come so soon after the tragic events surrounding the strike of Solidarity, the Polish labor union. The Solidarity strikers proclaimed that the rights to organize collectively and to strike for dignity and better treatment on the job were fundamental human freedoms. When the Polish government declared martial law and suppressed the union in December 1981, Americans especially mourned the loss of these basic liberties.

---

[1] See concurring opinions of Grodin, J. and Kaus, J. See also *In re Misener* (1985) *ante,* page 543 [213 Cal.Rptr. 569, 698 P.2d 637] and its antecedent, *People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776], which graphically illustrate this very problem.

The public reaction to the Solidarity strike revealed the strength of the American people's belief that the right to strike is an essential feature of a free society. In an economy increasingly dominated by large-scale business and governmental organizations, the right of employees to withhold their labor as a group is an essential protection against abuses of employer power. (See, e.g., *Amer. Foundries* v. *Tri-City Council* (1921) 257 U.S. 184, 209 [66 L.Ed. 189, 199, 42 S.Ct. 72, 27 A.L.R. 360].) Hence, it is widely presumed that "we have the right as free men to refuse to work for just grievances: the strike is an unalienable weapon of any citizen." (Reagan & Hubler, Where's the Rest of Me? (1965) p. 138.)

The majority opinion suggests that the right to strike may have constitutional dimensions. (Maj. opn., *ante*, at pp. 589-591.) I write separately to elaborate on this point. Although the right to strike has a long history in American jurisprudence, its textual and theoretical foundations have eluded a comprehensive analysis. Instead, the courts have danced a minuet around the issue. The time has come to make explicit that which has so frequently been presumed. If the right to strike does indeed differentiate this country from those that are not free, then it must be given substance and enforced.

The constitutional right to strike rests on a number of bedrock principles: (1) the basic personal liberty to pursue happiness and economic security through productive labor (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, §§ 1, 7, subd. (a)); (2) the absolute prohibition against involuntary servitude (U.S. Const., 13th Amend.; Cal. Const., art. I, § 6); and (3) the fundamental freedoms of association and expression (U.S. Const., 1st Amend.; Cal. Const., art. I, §§ 2, subd. (a), 3).

It is beyond dispute that the individual's freedom to withhold personal service is basic to the constitutional concept of "liberty." Without this freedom, working people would be at the total mercy of their employers, unable either to bargain effectively or to extricate themselves from an intolerable situation. Such a condition would make a mockery of the fundamental right to pursue life, liberty and happiness by engaging in the common occupations of the community. (See *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; see also *Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97, 110 [207 Cal.Rptr. 285, 688 P.2d 894] (conc. and dis. opn. of Bird, C. J.) [right to withhold personal service as a landlord is a constitutionally protected liberty interest]; *id.*, at p. 114 (dis. opn. of Mosk, J.) [same]; cf. U.S. Const., 13th Amend. [prohibiting involuntary servitude]; Cal. Const., art. I, § 6 [same].)

Nevertheless, in the early years of this country, the concerted withholding of labor was outlawed under the doctrine of "criminal conspiracy." (See

Frankfurter & Greene, The Labor Injunction (1930) pp. 2-3, and cases cited.) Although workers—with the exception of chattel slaves—enjoyed the right to leave employment as individuals, they were prohibited from doing so as a group. (*Ibid.*) Apparently, the courts assumed that working people could adequately protect their liberty interests by exercising their personal right to terminate employment and compete as individuals in the labor market.

As Archibald Cox has written, "[s]ome of the major problems of constitutional law . . . arise from the necessity of shaping guarantees born of an individualistic society to the conditions resulting from the solidarity of organized groups." (Cox, *Strikes, Picketing and the Constitution* (1951) 4 Vand.L.Rev. 574, 579 [hereafter Cox].) The recognition of group rights for laborers trailed behind the legal acceptance of the modern business corporation, a group form of property ownership.[2]

The right to strike was initially regarded as labor's counterpart to the massive economic power concentrated in the corporation. With the rise of monolithic business enterprises, it could no longer be maintained that employees' freedom to compete in the labor market as individuals would be sufficient to protect their liberty interests. In a famous dissenting opinion, Justice Oliver Wendell Holmes observed: "One of the eternal conflicts out of which life is made up is that between the effort of every man to get the most he can for his services, and that of society, disguised under the name of capital, to get his services for the least possible return. Combination on the one side is patent and powerful. Combination on the other is the necessary and desirable counterpart, if the battle is to be carried on in a fair and equal way." (*Vegelahn* v. *Guntner* (Mass. 1896) 44 N.E. 1077, 1081 (dis. opn. of Holmes, J.).)

In Holmes's view, the right to strike was integral to this latter combination: "If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the greatest possible return, it must be true that, when combined, they have the same liberty that combined capital has, to support their interests by argument, persuasion, and the bestowal or re-

---

[2]The modern form of corporate organization, which grants the corporate management broad powers to act on behalf of shareholders, emerged in the latter part of the 19th century. (See generally, Berle & Means, The Modern Corporation and Private Property (1939) pp. 127-152.) During the 1890's, the United States Supreme Court ruled that corporations possess constitutional rights. (See, e.g., *Chicago, &c. Railway Co.* v. *Minnesota* (1890) 134 U.S. 418 [33 L.Ed. 970, 10 S.Ct. 462] ["liberty"]; *Smyth* v. *Ames* (1898) 169 U.S. 466 [42 L.Ed. 819, 18 S.Ct. 418] ["property"].)

fusal of those advantages which they otherwise lawfully control." (*Vegelahn v. Guntner, supra,* 44 N.E. at p. 1081.)

This theoretical foundation was later adopted by the United States Supreme Court. In an opinion by Chief Justice Taft, the court declared: "[Unions] were organized out of the necessities of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body, in order, by this inconvenience, to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has, in many years, not been denied by any court." (*Amer. Foundries* v. *Tri-City Council, supra,* 257 U.S. at p. 209 [66 L.Ed. at p. 199].)

A few years later the high court, with Chief Justice Hughes writing, asserted that the right of employees to engage in "collective action" was "not to be disputed." (*Texas & N. O. R. Co.* v. *Ry. Clerks* (1930) 281 U.S. 548, 570 [74 L.Ed. 1034, 1046, 50 S.Ct. 427].) Finally, the court proclaimed that employees' rights of self-organization were "fundamental" in nature. (*Labor Board* v. *Jones & Laughlin* (1937) 301 U.S. 1, 33 [81 L.Ed. 893, 909, 57 S.Ct. 615, 108 A.L.R. 1352].)

Though these forceful statements suggest that the Supreme Court included the right to strike among those liberties protected by the Constitution, that proposition was never squarely asserted. Instead, a federal district court was the first to define the right in unambiguous terms: "The right to peaceably strike or to participate in one, to work or refuse to work, and to choose the terms and conditions under which one will work, like the right to make a speech, are fundamental human liberties which the state may not condition or abridge in the absence of grave and immediate danger to the community." (*Stapleton* v. *Mitchell* (D.Kan. 1945) 60 F.Supp. 51, 61, app. dism. by stip., 326 U.S. 690 [90 L.Ed. 406, 66 S.Ct. 172] [invalidating a Kansas law that prohibited various labor activities, including strikes]; see also *Alabama State Federation of Labor* v. *McAdory* (1944) 246 Ala. 1 [18 So.2d 810, 827-828] [striking down Alabama law that prohibited all strikes not endorsed by a majority of the struck employer's employees].)

The status of the right to strike as a constitutionally protected "liberty" arises not only from the considerations of fairness set forth by Justice

Holmes and Chief Justices Taft and Hughes, but also from the inherent nature of work. In the words of Justice Felix Frankfurter, "[t]he coming of the machine age tended to despoil human personality. It turned men and women into 'hands.' The industrial history of the early Nineteenth Century demonstrated the helplessness of the individual employee to achieve human dignity in a society so largely affected by technological advances. Hence the trade union made itself increasingly felt, not only as an indispensable weapon of self-defense on the part of workers but as an aid to the well-being of a society in which work is an expression of life and not merely the means of earning subsistence." (*A.F. of L.* v. *American Sash Co.* (1949) 335 U.S. 538, 542-543 [93 L.Ed. 222, 225, 69 S.Ct. 258, 6 A.L.R.2d 481] (conc. opn. of Frankfurter, J.).)

Perhaps in response to this concern, some courts—including a California Court of Appeal—adopted an absolutist position, recognizing no distinction whatever between the rights of employees to quit work as individuals or in a group: "It is the right of every man to engage to work for or to deal with, or to refuse to work for or to deal with, any man or class of men as he sees fit, whatever his motive or whatever the resulting injury, without being held in any way accountable therefor. [Citations.] These rights may be exercised in association with others so long as they have no unlawful object in view." (*Overland P. Co.* v. *Union L. Co.* (1922) 57 Cal.App. 366, 370-371 [207 P. 412]; see also Tobriner, *The Organizational Picket Line: Lawful Economic Pressure* (1951) 3 Stan.L.Rev. 423, 426, fn. 16 [in spite of four separate opinions, the decision of this court in *Parkinson Co.* v. *Bldg. Trades Council* (1908) 154 Cal. 581 [98 P. 1027] rests on the absolute right of a labor union to strike].)

It has been argued that constitutional protection for strike activities would intrude on the legislative function. The courts have exercised restraint in applying the constitutional guarantee of "liberty" to legislative determinations of economic policy. This restraint reflects the fear that the diffuse concept of liberty could be employed as a device for the imposition of judicial policy judgments. (See *Lochner* v. *New York* (1905) 198 U.S. 45, 74-76 [49 L.Ed. 937, 948-949, 25 S.Ct. 539] (dis. opn. of Holmes, J.).)

Nevertheless, the mere fact that an enactment covers economic matters does not insulate it from scrutiny where an important constitutional guarantee is implicated. The Constitution expressly protects certain rights of "property." (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, §§ 1, 7, subd. (a).) As Professor Cox has observed, "[a] constitution which assures the owner of property an opportunity to obtain a reasonable return on his capital must recognize the worker's interest in the conditions under

which he labors and the price he receives for his work." (Cox, *supra,* 4 Vand.L.Rev. at p. 580.)

Furthermore, recognition of the right to strike does not require an unconstrained judicial construction of the term "liberty." The courts can find constitutional guidance in the close nexus between the right to strike and a specific constitutional provision: the ban on involuntary servitude. (U.S. Const., 13th Amend.; Cal. Const., art. I, § 6.) Though this provision might not by itself guarantee the right to strike, it does provide clear support for the proposition that the strike is an exercise of constitutionally protected liberty.

Justice Brandeis once declared, in a case involving a peaceful, concerted refusal to work: "If, on the undisputed facts of this case, refusal to work can be enjoined, Congress [has] created . . . an instrument for imposing restraints upon labor which reminds of involuntary servitude." (*Bedford Co.* v. *Stone Cutters Assn.* (1927) 274 U.S. 37, 65 [71 L.Ed. 916, 928, 47 S.Ct. 522, 54 A.L.R. 791] (dis. opn. of Brandeis, J., joined by Holmes, J.); see also *France Packing Co.* v. *Dailey* (3d Cir. 1948) 166 F.2d 751, 758 (dis. opn. of O'Connell, J.) [construing War Labor Disputes Act to permit voluntary strikes in view of the constitutional ban on involuntary servitude].) Some courts have invalidated antistrike restrictions as inconsistent with the ban on involuntary servitude. (See e.g., *Henderson* v. *Coleman* (1942) 150 Fla. 185 [7 So.2d 117, 121]; *United States* v. *Petrillo* (N.D.Ill. 1946) 68 F.Supp. 845, 849, revd. (1947) 332 U.S. 1 [91 L.Ed. 1877, 67 S.Ct. 1538].)[3]

The close connection between the right to strike and the prohibition against involuntary servitude derives from the purposes of the 13th Amendment. That amendment guarantees the freedom to terminate employment not for its own sake, but in order to "prohibit[] that control by which the personal service of one man is disposed of or coerced for another's benefit which is the essence of involuntary servitude." (*Bailey* v. *Alabama* (1911) 219 U.S. 219, 241 [55 L.Ed. 191, 201, 31 S.Ct. 145].)

Accordingly, the amendment is concerned not merely with the formal right to quit, but also with the *practical ability of working people to protect their interests in the workplace*: "[I]n general the defense against oppressive hours, pay, working conditions, or treatment is the right to change employ-

---

[3]In *Petrillo,* the Supreme Court reversed the district court's holding as to involuntary servitude solely on the ground that the restriction at issue did not—on its face—prohibit strike activities. (*United States* v. *Petrillo, supra,* 332 U.S. at pp. 12-13 [91 L.Ed. at pp. 1885-1886].)

ers. When the master can compel and the laborer cannot escape the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of work." (*Pollock* v. *Williams* (1944) 322 U.S. 4, 18 [88 L.Ed. 1095, 1104, 64 S.Ct. 792]; see generally, Cox, *supra*, 4 Vand.L.Rev. at p. 576.)

As courts and commentators universally acknowledge, the group right to strike has replaced the individual right to "change employers" as the principal defense of working people against oppressive conditions. The rise of multinational corporations and large-scale government has produced a corresponding decrease in the practical significance of the right to quit for the individual. To withdraw the right to strike is to deprive the worker of his or her only effective bargaining power. (See maj. opn., *ante*, at pp. 589-590; see also Burton & Krider, *The Role and Consequences of Strikes by Public Employees* (1970) 79 Yale L.J. 418, 419-420, and sources cited.) This undeniable fact is reflected in the intensity of the public reaction to the suppression of the Solidarity strike.

Over 30 years ago, the question of whether the 13th Amendment protects the right to strike was termed "momentous" by two justices of the United States Supreme Court. (*A.F. of L.* v. *American Sash Co., supra*, 335 U.S. at p. 559 [93 L.Ed. at p. 234] (conc. opn. of Rutledge, J., joined by Murphy, J.) [expressly reserving judgment on the question].) Yet, that court has never squarely addressed the issue.[4]

The notion of a 13th Amendment right to strike has been rejected by some lower federal courts and state courts. These courts have relied on two lines of reasoning. First, some have suggested that the prohibition against involuntary servitude protects only the right of employees to withhold personal services as individuals. (See, e.g., *Western Union Tel. Co.* v. *International B. of E. Workers* (N.D.Ill. 1924) 2 F.2d 993, 994-995, affd. (7th Cir. 1925) 6 F.2d 444 [46 A.L.R. 1538].) However, as explained above, this line of

---

[4]The court came closest to confronting the issue in *Auto. Workers* v. *Wis. Board* (1949) 336 U.S. 245 [93 L.Ed. 651, 69 S.Ct. 516]. In that case, a union had conducted a series of "union meetings" at irregular times during work hours. The Wisconsin Employment Relations Board issued an order prohibiting any "concerted effort to interfere with production of the complainant *except by leaving the premises in an orderly manner for the purpose of going on strike.*" (*Id.*, at p. 250 [93 L.Ed. at p. 661], italics added.) The court sustained the order against a 13th Amendment challenge. Whatever the merits of this conclusion (see *id.*, at p. 269 [93 L.Ed. at p. 671] (dis. opn. of Murphy, J.) [the majority find the union's tactic objectionable only because it is effective]), it is clear that the court did not decide the general question of whether the 13th Amendment guaranteed the right to strike: "Our only question is . . . whether it is beyond the power of the State to prohibit the particular course of conduct described." (*Id.*, at p. 251 [93 L.Ed. at p. 661].)

argument cannot justify the total nonprotection of strike activities in an economy dominated by large and powerful employers. (See *ante,* at p. 598-599.)

Other courts have held that the 13th Amendment does not protect a *temporary* withholding of labor. (See, e.g., *Dayton Co.* v. *Carpet, Linoleum and Resilient Fl. D., etc.* (1949) 229 Minn. 87 [39 N.W.2d 183, 197-198], app. dism., (1950) 339 U.S. 906 [94 L.Ed. 1334, 70 S.Ct. 570].) However, in view of the purposes of the prohibition on involuntary servitude, "can it matter whether the worker quits permanently or merely leaves the establishment until conditions are changed? In the former case he may be said to be exercising the right to sell his services to the highest bidder, leaving others to take his former job, while in the latter case he is seeking to injure the employer by cutting off the supply of labor. But this reasoning scarcely justifies a constitutional distinction, for in either case the improvement of employment conditions ultimately depends upon a withholding of labor from marginal employers until they offer more. . . . [T]he temporary or permanent character of the quitting seems irrelevant." (Cox, *supra,* 4 Vand.L.Rev. at pp. 576-577.)

More fundamentally, it is not suggested here that the prohibition on involuntary servitude standing alone necessarily guarantees the right to strike. That provision does, however, provide ample support for the proposition that the right to strike must be counted among those constitutionally protected "liberties" that are essential to human freedom.

The concerted withholding of labor warrants protection not only as an exercise of personal liberty, but also as an incident of the fundamental freedoms of association and expression. (U.S. Const., 1st Amend.; Cal. Const., art. I, §§ 2, 3.) As the majority point out, the right of workers to combine and exert " 'various forms of economic pressure' " on employers is constitutionally protected. (Maj. opn., *ante,* at p. 588, quoting *In re Blaney* (1947) 30 Cal.2d 643, 647-648 [184 P.2d 892].)

Working people enjoy the constitutional right to form and join unions. (See, e.g., *Orr* v. *Thorpe* (5th Cir. 1970) 427 F.2d 1129, 1131; *American Federation of State, Co., & Mun. Emp.* v. *Woodward* (8th Cir. 1969) 406 F.2d 137, 139-140.) Without a constitutionally protected right to strike, the use of these freedoms would be "little more than an exercise in sterile ritualism." (*School Committee* v. *Westerly Teachers Ass'n* (1973) 111 R.I. 96 [299 A.2d 441, 448] (dis. opn. of Roberts, C. J.); see also *United Federation of Postal Clerks* v. *Blount* (D.D.C. 1971) 325 F.Supp. 879, 885 (conc. opn. of Wright, J.), affd. mem. 404 U.S. 802 [30 L.Ed.2d 38, 92 S.Ct. 80].)

Recent decisions concerning consumer boycotts provide persuasive authority for the protection of strikes under the guarantees of free association and expression.[5] Consumer boycotts were, like strikes, originally prohibited at common law. (See generally, Note, *Political Boycott Activity and the First Amendment, supra,* 91 Harv.L.Rev. at pp. 676-677.)

However, in a series of cases involving consumer boycotts by civil rights advocates, the courts began to recognize that such boycotts, like strikes, provide a necessary counterweight to entrenched economic power. In 1948, Justice Roger Traynor observed that "[i]n their struggle for equality the only effective economic weapon Negroes have is the purchasing power they are able to mobilize to induce employers to open jobs to them. . . . Only a clear danger to the community would justify judicial rules that restrict the peaceful mobilization of a group's economic power to secure economic equality." (*Hughes* v. *Superior Court* (1948) 32 Cal.2d 850, 868 [198 P.2d 885] (dis. opn. of Traynor, J.), affd. (1950) 339 U.S. 460 [94 L.Ed. 985, 70 S.Ct. 718]; see also *Garner* v. *Louisiana* (1961) 368 U.S. 157, 201 [7 L.Ed.2d 207, 239, 82 S.Ct. 248] (conc. opn. of Harlan, J.) [the First and Fourteenth Amendments protect sit-ins called to protest the racial practices of private businesses].)

In *NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886, 907-915 [73 L.Ed.2d 1215, 1232-1238, 102 S.Ct. 3409] (hereafter *Claiborne Hardware*), the United States Supreme Court held that a peaceful, politically motivated boycott constituted an exercise of the constitutional freedoms of association and expression. In that case, black citizens of Port Gibson, Mississippi, boycotted white-owned businesses to pressure those businesses and elected public officials to implement policies of racial equality. (*Id.,* at pp. 898-900 [73 L.Ed.2d at pp. 1226-1228]; *N. A. A. C. P.* v. *Claiborne Hardware Co.* (Miss. 1980) 393 So.2d 1290, 1295-1297.) The Mississippi Supreme Court affirmed the trial court's holding that the boycotted businesses were entitled to injunctive and monetary relief. (*Id.,* at pp. 1293, 1302.)

The United States Supreme Court reversed. (*Claiborne Hardware, supra,* 458 U.S. at p. 934 [73 L.Ed.2d at p. 1249].) The court rejected the common law view that boycotts were devoid of constitutional value by virtue of their coercive nature. "Speech does not lose its protected character . . . simply because it may embarrass others or coerce them into action." (*Id.,*

---

[5]A boycott is an organized refusal to deal. (See Note, *Political Boycott Activity and the First Amendment* (1978) 91 Harv.L.Rev. 659.) A strike is one form of boycott—i.e., an organized refusal by workers to provide labor.

at p. 910 [73 L.Ed.2d at p. 1234].) On the contrary, the boycott was entitled to protection as an effective and nonviolent means of bringing about political, social, and economic change. (*Id.*, at pp. 907-915 [73 L.Ed.2d at pp. 1232-1238].) Accordingly, "[t]he right of the States to regulate economic activity could not justify a complete prohibition" against the boycott. (*Id.*, at p. 914 [73 L.Ed.2d at p. 1237].)[6]

This court has recently had occasion to apply the principles announced in *Claiborne Hardware*. In *Environmental Planning & Information Council* v. *Superior Court* (1984) 36 Cal.3d 188 [203 Cal.Rptr. 127, 680 P.2d 1086] (hereafter *Environmental Planning*), an environmental group sought to influence a newspaper's editorial policies by boycotting businesses that advertised in the newspaper. The newspaper's publisher brought suit claiming tortious interference with an economic relationship.

This court rejected the publisher's argument that only civil rights boycotts should be accorded constitutional protection: "As in *Claiborne Hardware*, . . . [the boycotters'] activities constitute a 'politically motivated boycott designed to force governmental and economic change' (458 U.S. at p. 914[]), and the fact that the change which they seek bears upon environmental quality rather than racial equality, can hardly support a different result." (*Environmental Planning, supra,* 36 Cal.3d at p. 197.) Applying common law principles in light of federal and state constitutional guarantees, the court held that the environmental group was engaging in lawful activity. (*Id.*, at pp. 197-198.)

I see no principled basis for granting protection to "politically motivated" consumer boycotts while withdrawing protection from labor boycotts. In *Environmental Planning,* this court expressly reserved the question whether *Claiborne Hardware*'s apparent distinction between political and labor boycotts reflects the dictates of the California Constitution. (36 Cal.3d at p. 198, fn. 9.) The prior decisions both of this court and of the United

---

[6]The court's analysis covered both the boycott itself and the expressive activities used to sustain and expand it. (*Claiborne Hardware, supra,* 458 U.S. at pp. 907-912 [73 L.Ed.2d at pp. 1232-1236].) A boycott is at once a form of association and a means of expression. The decision to boycott results from processes of assembly and debate. (See, e.g., *id.*, at p. 907 [73 L.Ed.2d at p. 1232].) Once commenced, the boycott is a form of symbolic expression. Most obviously, it forcefully communicates the participants' views to the target. Further, as a newsworthy event, the boycott provides the participants with a platform for explaining and advocating their views to the public. They pay for this platform by foregoing the benefits of trade or employment. (Compare *Citizens Against Rent Control* v. *Berkeley* (1981) 454 U.S. 290, 296 [70 L.Ed.2d 492, 498-499, 102 S.Ct. 434] [the contribution and expenditure of money are essential to effective advocacy since the means for communicating with the public are costly].) In short, the boycott is a nonviolent method of conveying not only the content but also the intensity of the participants' views.

States Supreme Court indicate that labor boycotts should be entitled to full constitutional protection.

Differential treatment of political and labor activity runs afoul of the well-established principle of judicial impartiality among speakers and messages. "Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." (*N. A. A. C. P.* v. *Alabama* (1958) 357 U.S. 449, 460-461 [2 L.Ed.2d 1488, 1498-1499, 78 S.Ct. 1163], quoted by the majority, *ante,* at p. 587, fn. 37; see also *Environmental Planning, supra,* 36 Cal.3d at p. 197.)

Similarly, labor unions are entitled to no less protection than civil rights organizations and environmental groups. "The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 777 [55 L.Ed.2d 707, 718, 98 S.Ct. 1407].)

If these principles of judicial neutrality held sway without qualification, the political-labor distinction could be rejected without further discussion. However, as this court has recognized, "commercial" expression is accorded a lowered level of protection. (See *Environmental Planning, supra,* 36 Cal.3d at p. 197; accord *Bolger* v. *Youngs Drug Products Corp.* (1983) 463 U.S. 60, 64 [77 L.Ed.2d 469, 476, 103 S.Ct. 2875, 2879].)

The United States Supreme Court has defined commercial speech alternately as "speech which does 'no more than propose a commercial transaction'" (*Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 762 [48 L.Ed.2d 346, 358, 96 S.Ct. 1817]) or "expression related solely to the economic interests of the speaker and its audience" (*Central Hudson Gas & Elec.* v. *Public Serv. Comm'n* (1980) 447 U.S. 557, 561 [65 L.Ed.2d 341, 348, 100 S.Ct. 2343]). Labor expression cannot be reduced to such narrow concerns. It should not be relegated to the lowered protection accorded commercial expression.

Labor disputes cover a broad range of issues, many of which involve basic concerns of liberty. "A collective bargaining agreement is an effort to erect a system of industrial self-government." (*Steelworkers* v. *Warrior & Gulf Co.* (1960) 363 U.S. 574, 580 [4 L.Ed.2d 1409, 1416, 80 S.Ct. 1347].) For the bulk of each day, working people are subject to the codes of conduct that govern their workplaces. Those codes—whether embodied in collective

bargaining agreements, employer rule books, or informal practices—govern matters ranging from race relations to permission to use the bathroom. (See generally, Shulman, *Reason, Contract, and Law in Labor Relations* (1955) 68 Harv.L.Rev. 999, 1002-1008 [hereafter Shulman]; Cox, *Reflections Upon Labor Arbitration* (1959) 72 Harv.L.Rev. 1482, 1490.) While on the job, working people feel the force of these rules more immediately and directly than those of the government.

Herein lies the link between the guarantee of personal liberty, as informed by the ban on involuntary servitude, and the freedoms of association and expression. The issues that arise in the workplace rival those addressed in the political process in their actual impact on the breadth of liberty enjoyed by working people. The strike is an essential weapon in the worker's defense against "that control by which the personal service of one man is disposed of or coerced for another's benefit . . . ." (*Bailey* v. *Alabama, supra,* 219 U.S. at p. 241 [55 L.Ed. at p. 201]; see *ante,* at pp. 598-599. And, it is a weapon that employs the constitutionally favored methods for promoting change: peaceful association and expression. (See *ante,* at p. 602 & fn. 6.) Surely, the Constitution protects the efforts of working people to preserve and expand their liberties by means of nonviolent—albeit outspoken and impolite—forms of association and expression. (Cf. *Claiborne Hardware, supra,* 458 U.S. at pp. 907-912 [73 L.Ed.2d at pp. 1232-1236].)

As the Polish strikers discovered, a free labor organization cannot coexist with political tyranny. The converse is no less true: "Collective bargaining is today, as Brandeis pointed out, the means of establishing industrial democracy as the essential condition of political democracy, the means of providing for the workers' lives in industry the sense of worth, of freedom, and of participation that democratic government promises them as citizens." (Shulman, *supra,* 68 Harv.L.Rev. at p. 1002.)[7]

The fact that unions and their members seek increased compensation as well as greater liberty does not lower the expression of their grievances to the level of commercial speech. In the words of Congress, "[t]he labor of a human being is not a commodity or article of commerce." (15 U.S.C. § 17.) Unlike the sale of a commodity, the sale of labor gives rise to rights of control over a person's time and activity. The employer obtains not only the product of the employee's labor, but also considerable power to dictate when and how the work will be performed. (See generally, Dept. of Health,

---

[7]The Constitution does not mandate collective bargaining. Whatever the particular system of labor relations, a degree of liberty in the employment relationship is essential to democracy.

Ed. & Welf., Work in America (1973) [hereafter HEW Report].) The amount of compensation is, in part, a tradeoff for personal subordination. This feature of wages and benefits explains why the 13th Amendment, a guarantee of personal liberty, is concerned with "the defense against oppressive hours, pay [and] working conditions." (*Pollock* v. *Williams, supra,* 322 U.S. at p. 18 [88 L.Ed. at p. 1104].)[8]

In short, the asserted political-labor distinction provides no basis for denying to working people and unions the protection afforded civil rights activists and environmentalists. Accordingly, a restraint on the right to strike should be upheld under the California Constitution only if it serves a compelling state interest by the least restrictive means.[9]

---

[8]Over a century ago, John Stuart Mill eloquently expressed a view of liberty in the employment relation: "Human nature is not a machine to be built after a model, and set to do exactly the work prescribed for it, but a tree, which requires to grow and develop itself on all sides, according to the tendency of the inward forces which make it a living thing." (Mill, On Liberty (Shields edit. 1956) p. 72.) More recently, it has been widely recognized that issues relating to authority and work content are of central importance in labor relations. (See, e.g., HEW Report; Hill, Competition and Control at Work (1982) pp. 16-44; Hirszowicz, Industrial Sociology (1982); Work in America: The Decade Ahead (Kerr & Rosow edits. 1979); Martin, Contemporary Labor Relations (1979) pp. 125-129; Tepperman, Not Servants Not Machines: Office Workers Speak Out (1976); Case Studies on the Labor Process (Zimbalist edit. 1979).) Whatever one's views on the question of personal liberty in the workplace, it is clear that debate and controversy over that issue cannot be reduced to the status of purely "commercial" speech.

[9]The notion that the United States Constitution protects the right to strike was rejected by a two-judge majority in *United Federation of Postal Clerks* v. *Blount, supra,* 325 F.Supp. 879, affd. mem. 404 U.S. 802 [30 L.Ed.2d 38, 92 S.Ct. 80] (hereafter *Blount*). However, the California Constitution possesses independent vitality. (See, e.g., *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764-766 [135 Cal.Rptr. 345, 557 P.2d 929].) Hence, *Blount* is not binding authority as to the state constitutional claim. Nor did the *Blount* court provide any persuasive reasoning in support of its holding.

First, the *Blount* court erroneously suggested that since the common law provided no protection for strikes, neither did the United States Constitution. (*Blount, supra,* 325 F.Supp. at p. 882.) The court did not have the benefit of the *Claiborne Hardware* decision, which held that a consumer boycott was constitutionally protected in spite of the fact that such boycotts had been prohibited under the common law. (458 U.S. at pp. 907-915 [73 L.Ed.2d at pp. 1232-1238].) Moreover, this court today overturns the common law ban on public employee strikes in this state.

Next, the court asserted that the right to strike was fully protected for the first time by section 7 of the National Labor Relations Act (NLRA). (*Blount, supra,* 325 F.Supp. at p. 882.) However, as the Chief Justice of the Rhode Island Supreme Court has explained, the NLRA presumed that working people already possessed the right to strike: "The fact is that § 7 of that act makes no mention of the right to strike. In § 13 thereof reference is made to the right to strike as follows: 'Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right.' Obviously, § 13 is a rule of construction. [Citation.] It is my opinion that the NLRA recognized the rights which labor already had and was intended to afford those rights extensive legislative protection." (*School Committee* v. *Westerly Teachers Ass'n, supra,* 299 A.2d at p. 447 (dis.

The right to strike must be guaranteed to public and private employees alike. In accepting public employment, individuals do not thereby sacrifice their constitutional rights. (See, e.g., *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 503-505 [55 Cal.Rptr. 401, 421 P.2d 409].) The constitutional guarantees of personal liberty, freedom of association, and freedom of expression are no less important to public workers than to other working people.

At one time, the ban on public employee strikes might have been described as a limited exception to the general right to strike. However, between 1930 and 1970, public employees increased from about 3.2 million to more than 13 million. As a percentage of the work force, public employment rose from approximately 6.5 percent to over 15 percent, with state and local workers accounting for most of the increase.[10] There would be an obvious inconsistency were this court to recognize that the right to strike is essential to a free society while denying that right to a significant proportion of the working population.

It has been argued that public employee strikes lack constitutional protection since they enable public workers to exercise a disproportionate influ-

---

opn. of Roberts, C. J.).)

Nowhere did the *Blount* court address the concerns set forth in the present opinion.

Other federal authorities are no more persuasive. In two cases decided prior to *Claiborne Hardware, supra,* 458 U.S. 886, the Supreme Court summarily rejected First Amendment claims by labor unions. (See *NLRB* v. *Retail Store Employees* (1980) 447 U.S. 607, 616 [65 L.Ed.2d 377, 385-386, 100 S.Ct. 2372] [upholding restriction on peaceful consumer boycott picketing]; *Longshoremen* v. *Allied International, Inc.* (1982) 456 U.S. 212, 226-227 [72 L.Ed.2d 21, 32, 102 S.Ct. 1656] [upholding prohibition against longshoremen refusing to handle cargo bound to or from the Soviet Union].) However, in each case, the court provided only one paragraph of explanation, relying mainly on the "coercive" nature of boycott activities. The subsequent decision in *Claiborne Hardware* undercut this reasoning. Peaceful boycott activities were held protected in spite of their coercive aspects. (458 U.S. at p. 910 [73 L.Ed.2d at p. 1234].) Clearly, there is no principled basis for refusing to apply this approach in the labor context. (See *ante,* at pp. 602-605; see also Pope, *The Three-Systems Ladder of First Amendment Values: Two Rungs and a Black Hole* (1984) 11 Hastings Const. L.Q. 189, 232-246; Getman, *Labor Law and Free Speech: The Curious Policy of Limited Expression* (1984) 43 Maryland L.Rev. 4, 12-19; Harper, *The Consumer's Emerging Right to Boycott: NAACP* v. *Claiborne Hardware and Its Implications for American Labor Law* (1984) 93 Yale L.J. 409 [hereafter Harper]; Note, *Labor Picketing and Commercial Speech: Free Enterprise Values in the Doctrine of Free Speech* (1982) 91 Yale L.J. 938; Note, *Peaceful Labor Picketing and the First Amendment* (1982) 82 Colum.L.Rev. 1469.)

[10]These figures were compiled from United States Department of Commerce's Statistical Abstract of the United States, page 303, table No. 487 (1984) [hereafter Statistical Abstract]; 1 United States Department of Commerce, Bureau of the Census, Historical Statistics of the United States, Colonial Times to 1970 (1975) Series D 11-25, page 127; 2 United States Department of Commerce, Bureau of the Census, Historical Statistics of the United States, Colonial Times to 1970, *supra,* Series Y 272-289, page 1100, Series Y 308-317, page 1102, Series Y 332-334, page 1104.

ence on the political process. In this view, the principles announced in *Claiborne Hardware* should apply only to consumer boycotts. The power to withhold patronage is said to be less dangerous than the power to withhold labor because consumer power is more widely dispersed. (See generally Harper, *supra,* 93 Yale L.J. at pp. 426-427.)

However, as the present majority opinion explains, the coercive potential of public employee strikes is sharply limited by economic and political conditions. Many government services can be foregone over substantial periods without serious harm. Others can be contracted out to private industry. Where services are financed by user fees, the users can exert effective pressure against the strikers. Last but not least, the taxpaying public in general frequently mounts effective opposition to public employee strikes. (See maj. opn., *ante,* at pp. 578-579.)

On a deeper level, the constitutional considerations behind the right to strike are, if anything, more compelling than those supporting the right to withhold patronage. Consumer boycotts, unlike strikes, do not implicate either the fundamental liberty to pursue happiness through labor or the prohibition against involuntary servitude. (See *ante,* at pp. 596-600.)

Furthermore, the argument of "disproportionate" political influence is untenable in view of the United States Supreme Court's treatment of monetary wealth, perhaps the most concentrated form of economic power.[11] Restrictions on political expenditures and contributions are subject to strict judicial scrutiny. (*Buckley* v. *Valeo* (1976) 424 U.S. 1, 15-19, 58-59 [46 L.Ed.2d 659, 685-688, 710, 96 S.Ct. 612].) Corporations as well as individuals enjoy the right to employ concentrated wealth in the political process. (*First National Bank of Boston* v. *Bellotti, supra,* 435 U.S. at pp. 777, 789-792 [55 L.Ed.2d at pp. 725-728].)

In *Citizens Against Rent Control* v. *City of Berkeley, supra,* 27 Cal.3d 819, this court addressed the constitutionality of a Berkeley city ordinance that prohibited contributions of more than $250 per person to committees formed to support or oppose a ballot measure. The court held that the ordinance was necessary to serve the compelling governmental interest in

---

[11] As of 1972, 1 percent of the population held over 20 percent of the nation's personal wealth. (See *Statistical Abstract, supra,* at p. 487, table No. 794.) Some 218,000 individuals possessed estates worth over $10 million each. (*Id.,* at p. 479, table No. 791.) As this court has recognized, such wealth can enable the possessor to exercise a disproportionate influence on the political process. (*Citizens Against Rent Control* v. *City of Berkeley* (1980) 27 Cal.3d 819, 826-827 [167 Cal.Rptr. 84, 614 P.2d 742], revd. *sub nom. Citizens Against Rent Control* v. *Berkeley, supra,* 454 U.S. 290 [70 L.Ed.2d 492, 102 S.Ct. 434].)

preventing well-financed special interest groups from dominating the referendum process. (*Id.*, at pp. 825-829, 832.)

The United States Supreme Court reversed. (*Citizens Against Rent Control* v. *Berkeley, supra,* 454 U.S. 290 [hereafter *CARC*].) The high court reasoned that the pooling of financial resources was essential to effective advocacy because of the rising costs of advertising and direct mail. (*Id.*, at p. 296, fn. 5 [70 L.Ed.2d at p. 499]; accord *Federal Election Commission* v. *National Conservative Political Action Committee* (1985) — U.S. —, — [84 L.Ed.2d 455, 467-468, 105 S.Ct. 1459, 1467-1468].) Further, the court rejected this court's view that the city could restrict the use of concentrated wealth by special interest groups in order to assure others an equal voice in the political process. (*CARC, supra,* 454 U.S. at pp. 295-296 [70 L.Ed.2d at pp. 498-499].)

In *Claiborne Hardware, supra,* 458 U.S. 886, the high court made clear that its concern for effective advocacy was not limited to the expenditure of money, a form of economic power that is possessed primarily by the wealthy. Instead, the court extended the reasoning of *CARC* to cover the collective withholding of patronage, a form of economic influence available to ordinary consumers. (*Id.*, at pp. 907-915 [73 L.Ed.2d at pp. 1232-1238].)

The strike, a combination for the purpose of withholding labor, is no less essential to working people than was the pooling of wealth to the landlords in *CARC* or the collective withholding of purchasing power to the civil rights activists in *Claiborne Hardware.* While working people cannot compete with wealthy individuals or corporations in paying for access to mass communications, they can bring their causes to the public's attention by withholding the one asset that they possess in abundance—the capacity to engage in productive labor.

This court can scarcely deny to working people the protections that are accorded the forms of economic power possessed by other groups. As Justice Traynor once observed, the courts "should not impose ideal standards on one side [of a conflict among groups in society] when they are powerless to impose similar standards upon the other." (*Hughes* v. *Superior Court, supra,* 32 Cal.2d at p. 868 (dis. opn. of Traynor, J.).)

It remains only to determine whether the common law's flat prohibition on public employee strikes is necessary to serve a compelling state interest. The majority have convincingly refuted the traditional justifications for that ban. (See maj. opn., *ante,* at pp. 573-580.) Although the state has a com-

pelling interest in averting immediate and serious threats to the public health and safety, a flat ban on public employee strikes is by no means the least restrictive method for accomplishing that end. (See *id.*, at p. 580.) Accordingly, today's holding is compelled not only by common law principles but also by the California Constitution.

**GRODIN, J.,** Concurring.—Though I have signed Justice Broussard's plurality opinion, I write separately in response to the concerns expressed in the concurring opinion by Justice Kaus.

I suggest there is little merit in attempting to distinguish, with regard to strikes by employees covered by the Meyers-Milias-Brown Act, between the availability of an injunction at common law and the availability of a damage action. If an injunction is violated, the violation can give rise to a proceeding in contempt for which monetary sanctions may be imposed. The underlying legal question is whether there exists a common law predicate for either remedy. The plurality opinion holds, and I agree, that the Meyers-Milias-Brown Act has removed the principal theoretical justification which had been advanced in this state for the proposition that all strikes by local government employees are tortious. Finding no alternative justification sufficiently compelling to require acceptance by the courts in the absence of legislative action, except as regards strikes which imperil public health or safety, the opinion properly places the ball in the Legislature's court, where it belongs. (*Ante,* p. 591, fn. 39.)

Other states and countries have developed a wide range of policies for dealing with public employee strikes, and the arena is clearly one in which experimentation should be encouraged. Consequently, I share Justice Kaus' concern that we should not attempt to prejudge the constitutionality of any particular legislative response. The plurality opinion explicitly finds it unnecessary to reach the issue in constitutional terms (*ante,* p. 591), and as I understand it discusses the Constitution only in order to demonstrate that were we to adopt the district's position—that there exists an absolute common law ban on public employee strikes in the context of the present statutory scheme—substantial questions of constitutional dimension would arise. (*Ibid.*) It is with that understanding that I join in the opinion.

**LUCAS, J.**—I respectfully dissent. In my view, public employees in this state neither have the right to strike, nor should they have that right. In any event, in light of the difficulty in fashioning proper exceptions to the basic "no strike" rule, and the dangers to public health and safety arising from even a *temporary* cessation of governmental services, the courts should defer to the Legislature, a body far better equipped to create such exceptions.

The majority paints a glowing picture of the public strike weapon as a means of "enhanc[ing] labor-management relations" (*ante,* p. 581), "equalizing the parties' respective bargaining positions," (p. 583), assuring "good faith" collective bargaining (*ibid.*), and "providing a clear incentive for resolving disputes" (*ibid.*). Indeed, so enamored is the majority with the concept of the public strike that it elevates this heretofore *illegal* device to a "basic civil liberty." (*Ibid.*) Though wholly unnecessary to its opinion, the majority in dictum even suggests that public employees may have a *constitutional* right to strike which cannot be legislatively abridged absent some "substantial or compelling justification." (P. 590.)

Thus, in the face of an unbroken string of Court of Appeal cases commencing nearly 35 years ago which hold that public strikes are illegal, we suddenly announce our finding that public strikes are not only lawful in most cases, but indeed they may constitute a panacea for many of the social and economic ills which have long beset the public sector. One may wonder, as I do, why we kept that revelation a secret for all these years. (See *El Rancho Unified School Dist.* v. *National Education Assn.* (1983) 33 Cal.3d 946, 962 [192 Cal.Rptr. 123, 663 P.2d 893] [conc. opn. by Richardson, J.].)

Despite the majority's encomiums, the fact remains that public strikes may devastate a city within a matter of days, or even hours, depending on the circumstances. For this reason, among many others, the courts of this state (and the vast majority of courts in other states and the federal government) have declared *all* public strikes illegal. As indicated above, until today the California Courts of Appeal uniformly had followed that rule. (See, e.g., *Stationary Engineers* v. *San Juan Suburban Water Dist.* (1979) 90 Cal.App.3d 796, 801 [153 Cal.Rptr. 666]; *Pasadena Unified Sch. Dist.* v. *Pasadena Federation of Teachers* (1977) 72 Cal.App.3d 100, 105-107 [140 Cal.Rptr. 41], hg. den.; *Los Angeles Unified School Dist.* v. *United Teachers* (1972) 24 Cal.App.3d 142, 145-146 [100 Cal.Rptr. 806], hg. den.; *Trustees of Cal. State Colleges* v. *Local 1352, S.F. State etc. Teachers* (1970) 13 Cal.App.3d 863, 867 [92 Cal.Rptr. 134], hg. den.; *City of San Diego* v. *American Federation of State etc. Employees* (1970) 8 Cal.App.3d 308, 310 [87 Cal.Rptr. 258], hg. den.; *Almond* v. *County of Sacramento* (1969) 276 Cal.App.2d 32, 35-36 [80 Cal.Rptr. 518], hg. den.; *Pranger* v. *Break* (1960) 186 Cal.App.2d 551, 556 [9 Cal.Rptr. 293], hg. den.; *Newmarker* v. *Regents of Univ. of Cal.* (1958) 160 Cal.App.2d 640, 646 [325 P.2d 558]; *City of L.A.* v. *Los Angeles etc. Council* (1949) 94 Cal.App.2d 36, 46-47 [210 P.2d 305], hg. den.)

Justice Coughlin's opinion in the *City of San Diego* case offers a cogent analysis of the various rationales underlying the "no strike" rule. He ob-

served that "This California common law rule is the generally accepted common law rule in many jurisdictions. [Citations, including cases from 24 states.]

"The common law rule has been adopted or confirmed statutorily by 20 states and the federal government. [Citations.]

". . . The common law rule [that] public employees do not have the right to bargain collectively or to strike is predicated expressly on the necessity for and lack of statutory authority conferring such right. Where a statute authorizes collective bargaining and strikes it includes them within the methods authorized by law for fixing the terms and conditions of employment. *Those who advocate the right of public employees to strike should present their case to the Legislature.* [Italics added.]

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Wherever the issue has been raised, it has been held laws governing the rights of public employees to engage in union activities, collective bargaining, strikes and other coercive practices, not equally applicable to private employees, and vice versa, are premised on a constitutionally approved classification; and, for this reason, are not violative of the constitutional guarantee of equal protection of the law. [Citations.] [¶] The reasons for the law denying public employees the right to strike while affording such right to private employees are not premised on differences in types of jobs held by these two classes of employees but upon differences in the employment relationship to which they are parties. The legitimate and compelling state interest accomplished and promoted by the law denying public employees the right to strike is not solely the need for a particular governmental service but the preservation of a system of government in the ambit of public employment and the proscription of practices not compatible with the public employer-employee relationship. [Citation.]" (8 Cal.App.3d at pp. 311-315.)

The decision to allow public employee strikes requires a delicate and complex balancing process best undertaken by the Legislature, which may formulate a comprehensive regulatory scheme designed to avoid the disruption and chaos which invariably follow a cessation or interruption of governmental services. The majority's own proposal, to withhold the strike weapon only where "truly essential" services are involved (p. 580) and a "substantial and imminent threat" is posed (p. 586), will afford little guidance to our trial courts who must, on a "case-by-case" basis (*ibid.*), decide such issues. Nor will representatives of labor or management be able to

predict with any confidence or certainty whether a particular strike is a lawful one or, being lawful at its inception, will become unlawful by reason of its adverse effects upon the public health and safety. In short, the majority's broad holding will prove as unworkable as it is unwise.

Of the few states that permit strikes by public employees, virtually all do so by comprehensive statutory provisions. Some of the statutory schemes begin by creating classifications of employees, distinguishing, for example, workers whose services are deemed essential (e.g., police, firefighters), those whose services may be interrupted for short periods of time (e.g., teachers), and those whose services may be omitted for an extended time (e.g., municipal golf course attendants).[1] These schemes typically define various prerequisites to the exercise of the right to strike for those categories of workers permitted that option. The prerequisites include a period of mandatory mediation[2] as well as advance notice to the employer.[3] In addition, some statutory schemes lay out the ground rules for binding arbitration.[4]

In contrast, the majority's new California rule is hopelessly undefined and unstructured. In addition to the breadth of the majority's "truly essential" standard, the statutes presently provide no systematic classification of employees according to the nature of their work and the degree to which the public can tolerate work stoppages. Only firefighters are expressly prohibited from striking and giving recognition to picket lines. (Lab. Code, § 1962.) Moreover, the four principal statutory schemes regulating other public employees establish widely differing approaches to labor relations for different types and levels of employees. (Compare Gov. Code, §§ 3500-3510 [Meyers-Milias-Brown Act, covering local government employees]; 3512-3524 [State Employer-Employee Relations Act, covering state em-

---

[1]See Alaska Statutes section 23.40.200(a) (1972) (categorizing, first, all police, fire, correctional, and hospital workers; second, public utility, snow removal, sanitation, and education employees; and third, all other public workers). See also Minnesota Statutes Annotated section 179A.03 (West Supp. 1985) (defining "essential" workers, etc.).

[2]E.g., Alaska Statutes section 23.40.200(c) (1972) (mediation required); Illinois Public Act 83-1012, section 17 (1983) (Ill. Legis. Serv. 6781, to be codified at Ill. Ann. Stat. ch. 48, § 1617) (mediation required); Minnesota Statutes Annotated section 179A.18, subdivisions 1, 2 (West Supp. 1985) (mediation required for 45 days, 60 days in case of teachers); Pennsylvania Statutes Annotated, title 43, section 1101.1003 (Purden Supp. 1984) (mediation required); Wisconsin Statutes Annotated section 111.70(4)(cm) (West Supp. 1983) (mediation-arbitration required).

[3]E.g., Illinois Public Act 83-1012, section 17 (5 days' notice required); Minnesota Statutes Annotated section 179A.18, subdivision 3 (West Supp. 1985) (10 days); Wisconsin Statutes Annotated section 111.70(4)(cm) (West Supp. 1983) (10 days).

[4]E.g., Minnesota Statutes Annotated section 179A.16 (West Supp. 1985); Wisconsin Statutes Annotated section 111.70(4)(jm) (West Supp. 1983).

ployees]; 3540-3549.3 [Ed. Employment Relations Act, covering public school employees]; 3560-3599 [governing employment in higher education].) Thus, these statutes produce inconsistent results when, as here, the right to strike is given recognition almost across the board.

The Meyers-Milias-Brown Act, for example, provides "no clear mechanism for resolving disputes" between local governments and their workers. (*Ante*, p. 572, fn. 14.) In the absence of an administrative agency to settle charges of unfair labor practices and compel such remedies as mediation, presumably all strike-related issues will go to the courts in the first instance, but the courts are poor forums for the resolution of such issues. On the other hand, issues arising out of work stoppages by public school employees are to be resolved by the Public Employee Relations Board (PERB) on the basis of PERB's own set of remedies. Of course, this anomalous situation is in large part the product of this court's tolerance of strikes by teachers (*El Rancho Unified Sch. Dist.* v. *National Ed. Assn.*, *supra*, 33 Cal.3d 946; *San Diego Teachers Assn.* v. *Superior Court* (1979) 24 Cal.3d 1 [154 Cal.Rptr. 893, 593 P.2d 838]) and PERB's correlative expansion of its authority so that it may compel mediation or adopt other remedies in labor disputes in public education (see Cal. Admin. Code, tit. 8, § 32000 et seq.).

Finally, nothing in PERB's explicit statutory powers (Gov. Code, § 3541.3) extends to mandatory arbitration, for example, so it remains to be established whether state employees, also under PERB's jurisdiction (*id.*, § 3513, subd. (g)), will be governed by the same ground rules as educational employees, or whether some of them, perhaps deemed "truly essential," will be subject to binding arbitration under rules that do not now exist.

I would affirm the judgment.

Respondent's petition for a rehearing was denied June 27, 1985.